Filed 3/24/17

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION FIVE

|  |  |
|---|---|
| In re ADAM LOZA,<br><br>on Habeas Corpus. | B279566<br><br>(Los Angeles County<br>Super. Ct. No. TA087610) |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus.  William R. Chidsey, Judge.  Petition denied.

Matthew Alger, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Viet H. Nguyen, Deputy Attorney General, for Respondent.

# INTRODUCTION

A jury convicted petitioner Adam Loza of two counts of first degree murder and two counts of attempted robbery. The jury found true the Penal Code section 190.2[1] special circumstance allegations that the murders were committed while petitioner was engaged in the attempted commission of a robbery or burglary. In accordance with the section 190.2 robbery/burglary special circumstance findings, the trial court sentenced petitioner to consecutive prison terms of life without the possibility of parole on his murder convictions.

On direct appeal, petitioner argued, among other things, that insufficient evidence supported the jury's robbery/burglary special circumstance findings. We affirmed the judgment of conviction in an unpublished opinion, *People v. Loza* (May 7, 2010, B212250) (*Loza*).

In 2015, the California Supreme Court held in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) that, under section 190.2, subdivision (d), an aider and abettor of felony murder who lacks the intent to kill may be sentenced to a term of life without the possibility of parole only if the aider and abettor was a "major participant" in the crime and acted with "reckless indifference to human life." Relying on *Banks*, petitioner filed a petition for writ of habeas corpus in the Supreme Court challenging the sufficiency of the evidence supporting the jury's robbery/burglary special circumstance findings. Citing *Banks*, the Supreme Court ordered the Secretary of the Department of Corrections and

---

[1]    All statutory citations are to the Penal Code unless otherwise noted.

Rehabilitation to show cause in this court "why petitioner is not entitled to the relief requested."

Having reviewed the record in light of our Supreme Court's most recent guidance (namely *Banks, supra,* 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*)) concerning a defendant aider and abettor's culpability along the so-called *Enmund-Tison* continuum (*Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*)), we hold that sufficient evidence supports the jury's section 190.2 robbery/burglary special circumstance findings in this case. Accordingly, we deny the petition for writ of habeas corpus.

## BACKGROUND

### I.  Factual Background

For purposes of our analysis, we repeat the factual background set forth in our unpublished opinion in *Loza*:

"During the early morning hours of November 4, 2006, [petitioner] was riding around in a red Ford Explorer driven by co-defendant Julio Perez.  [Fn. omitted.]  Co-defendant Eric Sanford, Gilbert Rivera, Christopher Perez ('Christopher') and Sara Graeff were passengers.  Christopher is Julio Perez's brother.  He was dating Graeff at the time.  They had been drinking beer.

"At some point, Perez saw co-defendant Sanford and stopped the car.  [Fn. omitted.]  Sanford came up to the Explorer and said, 'I just shot someone in the head.  Let me in the car.  Let me in the car.'  The occupants of the Explorer thought Perez was kidding.  Sanford got into the Explorer.  At some point, he put the gun in the back of the Explorer.

3

"There was a discussion about stealing some beer. Sanford stated: 'Let's go get some beer, I'm down, I'm down.' [Petitioner] stated that he would hold the door for Sanford.

"About 4:00 a.m., Perez drove to a Mobil service station located at 22240 Avalon Boulevard in Carson (hereafter 'Mobil'). The Mobil was open 24 hours a day and consisted of a gas station, automotive repair garage, and a Mobil mini convenience store. The Mobil sold beer, but the beer coolers were locked from 2:00 a.m. to 6:00 a.m. At 4:05 a.m., [co-defendant] Perez purchased five dollars worth of gasoline. At 4:07 a.m., [co-defendant] Perez pumped the gasoline. He then drove the Explorer to the side of the Mobil.

"[Petitioner], Perez and Sanford got out of the Explorer. Perez gave a sweater to [petitioner], who put it around his head. Graeff told police that [petitioner] gave the gun to Sanford. [Petitioner] and Sanford walked towards the Mobil. Perez stayed behind inside the Explorer. About three minutes later, Sanford and [petitioner] ran back and got inside the Explorer. Perez drove away. [Petitioner] was hysterical and yelling, 'You just shot them. You just shot them. You just shot them. I can't believe you just shot them.' Someone said to Sanford: 'You shot them? Did you really shoot them?' Sanford stated, 'I counted down, and I told them to give me their money, and they didn't— they didn't give it to me fast enough, so I shot them.'

"At 5:00 a.m., Ronald Hasty, the owner of the Mobil, went to the Mobil. There, he found the front door unlocked. Hasty looked for his two employees, Eduardo Roco and Ester Ortiega, who had been working the overnight shift. Roco had been working at the Mobil for a 'few years,' and primarily worked the

4

overnight shift. Ortiega had been working at the Mobil for a couple of weeks and was being trained by Roco.

"Hasty did not see Roco and Ortiega. The window of the bullet proof glass booth was open about 24 to 30 inches. The cash register was inside this booth. Hasty walked to the clear bullet proof glass door of the booth and saw Roco and Ortiega lying dead on the floor. Hasty called 911.

"Los Angeles County Deputy Sherriff Tanya Brown responded to the call. Deputy Brown observed that the Mobil's cash register was enclosed in a bullet proof glass booth, but the window to the booth was open. Behind the cash register, Roco and Ortiega were lying, dead. On the counter, there were three 'Slim Jims' and a pack of 'Apple Sour Candies.'

"Roco had suffered a rapidly fatal gunshot wound to the chest with an exit wound in his back. Ortiega had suffered a rapidly fatal gunshot wound to her upper left back with the bullet in the right side of her chest.

"Fingerprints were taken from the Slim Jims and Sour Apple gummy candies. Five latent prints were found on the Slim Jims. Sanford's left middle fingerprint matched a print found on one of the Slim Jims.

"On November 11, 2006, [petitioner] was interviewed by Los Angeles County Sheriff's Detective Dan McElderry and Sergeant Ken Perry. [Petitioner] stated that when Sanford first got into the Explorer, he showed them a revolver. Perez told Sanford to put the gun in the back of the Explorer and he complied. At the Mobil station, after Perez purchased gas, [petitioner] suggested that they do a beer run. Sanford stated: 'You gonna buy a beer, man you might as well just go in and rob them.' [Petitioner] agreed to hold the door open for Sanford.

5

"[Petitioner] said that he 'always comes over here to this gas station' and that the clerk knew him and his family. Perez told [petitioner] to take his shirt. [Petitioner] used this shirt to cover his head. Sanford said to [petitioner]: 'I'm going in there, you just hold the door.' [Petitioner] waited outside the Mobil for about one minute, then went inside. He saw Sanford walk up to the register and say: 'Give me the money.' The male clerk said: '[T]here's no money. There's a drop safe.' Sanford said: 'Man, you got five seconds.' The male clerk said: 'Shoot me.' [Petitioner] heard 'two soft little pops.' Sanford said: 'Let's get out of here. Let's get out of here.' They ran back to the Explorer and got inside. The Explorer drove off.

"Sanford testified in his own defense at trial. He went into the Mobil to buy something to eat. He did not have a gun. As he was walking toward the Mobil, he asked the occupants of the Explorer whether they wanted anything. He saw Perez hand [petitioner] a shirt. While Sanford was in the Mobil buying food, [petitioner] came in the store and ordered the clerks to give him money out of the cash register. When the clerk stated that the money was in the drop safe, [petitioner] shot both clerks.

"[Petitioner] testified on his own behalf at trial. He stated that Sanford had a gun when he got into the car. [Petitioner] did not want to do a beer run, but agreed to hold the door for Sanford. He put his shirt over his head because he knew the male clerk. He did not see anyone with a gun. He did not know that Sanford was armed. He believed that Sanford was going to do a beer run, but Sanford instead brought candy to the counter. Sanford leaned on the counter and said: 'Give me the money.' The male clerk replied: 'There's no money.' Sanford said: 'I ain't

playing. You got five seconds.' [Petitioner] ran back toward the Explorer. As he was running, he heard two 'pops.'"

## II.    Procedural Background

A jury convicted petitioner of two counts of first degree murder (§ 187, subd. (a)) and two counts of attempted robbery (§§ 211/664). The jury found true the special circumstance allegations that the murders were committed while petitioner was engaged in the attempted commission of a robbery or burglary (§ 190.2, subd. (a)(17)) and that petitioner was convicted of more than one first degree murder (§ 190.2, subd. (a)(3)). The jury also found true the allegation that a principal was armed in the commission of the offenses. (§ 12022, subd. (a)(1).) The trial court sentenced petitioner to consecutive prison terms of life without the possibility of parole on his murder convictions, plus 13 years and four months.

Petitioner appealed from the judgment of conviction, arguing, among other things, that the evidence was insufficient to support the jury's robbery/burglary special circumstance findings and that the trial court erred in instructing on the multiple murder special circumstance allegations. We affirmed the robbery/burglary special circumstance findings, struck the multiple murder special circumstance findings, corrected sentencing errors not relevant to petitioner's instant petition for writ of habeas corpus, and otherwise affirmed the judgment.

On June 17, 2010, petitioner filed a petition for writ of habeas corpus in the California Supreme Court (S183620) in part challenging the sufficiency of the evidence supporting the jury's robbery/burglary special circumstance findings. On January 19, 2011, the Supreme Court denied the petition.

7

On April 20, 2012, petitioner filed a petition for writ of habeas corpus in this court (B240643) arguing that defense counsel provided ineffective assistance in preparing for and defending petitioner at trial. On May 17, 2012, we denied the petition.

On June 11, 2012, petitioner filed a petition for writ of habeas corpus in this court (B241768) arguing prosecutorial misconduct and that the trial court erred in failing to give the jury a unanimity instruction concerning the target offense he allegedly committed for purposes of the felony murder guilty verdicts and the robbery/burglary special circumstance findings. On June 29, 2012, we denied the petition on the merits and as procedurally defaulted.

On October 1, 2012, petitioner filed a petition for writ of habeas corpus in the California Supreme Court (S204300) challenging the sufficiency of the evidence supporting the jury's robbery/burglary special circumstance findings. On October 17, 2012, citing *In re Clark* (1993) 5 Cal.4th 750, 767-769, the Supreme Court denied the petition.

On December 1, 2015, after our Supreme Court decided *Banks, supra,* 61 Cal.4th 788, petitioner filed a motion in this court to recall the remittitur and for leave to file a supplemental brief based on *Banks*. On December 10, 2015, we denied the motion on the grounds that *Banks* "does not represent a change in the law" and "provides no basis for relief under the facts of this case."

On January 14, 2016, petitioner filed the instant petition for writ of habeas corpus in the California Supreme Court claiming he was entitled to relief under *Banks, supra,* 61 Cal.4th 788. On April 20, 2016, the Supreme Court requested an

8

informal response on the merits. After the Department of Corrections and Rehabilitation filed an informal response and petitioner filed a reply to the informal response, the Supreme Court ordered the Secretary of the Department of Corrections and Rehabilitation to show cause in this court why petitioner is not entitled to the relief requested.

## DISCUSSION

I.   **Sufficient Evidence Supports the Jury's Robbery/Burglary Special Circumstance Findings**

Petitioner contends that insufficient evidence supports the jury's robbery/burglary special circumstance findings because the evidence fails to show that he was a major participant who acted with reckless indifference to human life. We disagree.

### A.   *Standard of Review*

"The standard of review for a sufficiency of the evidence claim as to a special circumstance is whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' [Citations.] The standard is the same under the state and federal due process clauses. [Citation.] We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial. [Citation.]" (*Clark, supra,* 63 Cal.4th at p. 610.)

9

## B.    The Enmund-Tison Continuum

Two United States Supreme Court decisions, *Enmund, supra,* 458 U.S. 782 and *Tison, supra,* 481 U.S. 137, help define the constitutional limits for punishing accomplices to felony murder.  (*Banks, supra,* 61 Cal.4th at p. 806.)  The defendants' conduct in those cases represent points on a continuum, a spectrum of culpability for felony-murder participants.  (*Id.* at pp. 800, 802, 811.)  At one end of this *Enmund-Tison* continuum is "'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.'  [Citation.]"  (*Banks, supra,* 61 Cal.4th at p. 800.)  At the other end are the "actual killers and those who attempted or intended to kill.  [Citation.]"  (*Ibid.*)  "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than . . . Enmund's lies the constitutional minimum" showing required for the imposition of death or life without the possibility of parole.  (*Id.* at p. 802.)

In *Banks, supra,* 61 Cal.4th 788, our Supreme Court summarized the conduct of the defendant at issue in *Enmund, supra,* 458 U.S. 782 as follows:  "Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person.  A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered.  When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys.  Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found.  He was convicted of robbery and first degree murder and sentenced to death.  [Citations.]"  (*Banks, supra,* 61 Cal.4th at p. 799.)

10

Our Supreme Court explained that in *Enmund, supra,* 458 U.S. 782, the United States Supreme Court "found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' (*Enmund v. Florida, supra,* 458 U.S. at p. 795.) Accordingly, it held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' (*Enmund,* at p. 797.) The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' (*id.* at p. 798), a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape' (*id.* at p. 788) cannot constitutionally be sentenced to death." (*Banks, supra,* 61 Cal.4th at p. 799.)

In *Banks, supra,* 61 Cal.4th 788, our Supreme Court summarized the conduct of the defendants at issue in *Tison, supra,* 481 U.S. 137 as follows: "Prisoner Gary Tison's sons Ricky, Raymond, and Donald Tison conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint. During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. Ricky and the cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his

11

cellmate then killed all four family members.  When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, only to die of exposure.  ([*Tison, supra,* 481 U.S.] at pp. 139-141.)  Ricky and Raymond Tison and the cellmate were tried and sentenced to death.  The trial court made findings that Ricky and Raymond's role in the series of crimes was "'very substantial'" and they could have foreseen their actions would "'create a grave risk of . . . death.'"  (*Id.* at p. 142.)  The Arizona Supreme Court denied relief.  (*Id.* at pp. 143-145.)" (*Banks, supra,* 61 Cal.4th at pp. 799-800.)

Our Supreme Court explained that in *Tison, supra,* 481 U.S. 137, "[t]he United States Supreme Court granted Ricky's and Raymond's petitions to consider the application of *Enmund* to these facts.  The court began by discussing at length and endorsing *Enmund*'s holding that the Eighth Amendment limits the ability of states to impose death for 'felony murder *simpliciter.*'  (*Tison v. Arizona, supra,* 481 U.S. at p. 147.)  Specifically, *Tison* described the range of felony-murder participants as a spectrum.  At one extreme were people like 'Enmund himself:  the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.'  (*Id.* at p. 149.)  At the other extreme were actual killers and those who attempted or intended to kill.  (*Id.* at p. 150.)  Under *Enmund, Tison* held, death was disproportional and impermissible for those at the former pole, but permissible for those at the latter.  (*Ibid.*)  The Supreme Court then addressed the gray area in between, the proportionality of capital punishment for felony-murder participants who, like the two surviving Tison brothers, fell 'into neither of these neat categories.'  (*Ibid.*)  Here, the court

12

announced, 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.' (*Id.* at p. 158.) This is the language the [California] electorate codified in section 190.2(d)." (*Banks, supra,* 61 Cal.4th at p. 800.)

As the codification of the principles set forth in *Enmund* and *Tison*, section 190.2, subdivision (d) provides in relevant part, "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."[2] Section 190.2, subdivision (d) "thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks, supra,* 61 Cal.4th at p. 798, fn. omitted.) There is significant overlap between being a major participant and having reckless indifference to human life. (*Clark, supra,* 63 Cal.4th at pp. 614-615.)

---

[2] Murder in the attempted commission of a robbery is a special circumstance under section 190.2, subdivision (a)(17)(A).

13

C.    *Petitioner's Placement Along the Enmund-Tison*
      *Continuum*

Considering the "totality of the circumstances," we find that the specific facts of petitioner's case place his conduct and state of mind on that side of the *Enmund-Tison* continuum sufficient to support the section 190.2 robbery/burglary special circumstance findings.  (*Banks, supra,* 61 Cal.4th at p. 802.)


1.    Major Participant

In deciding whether a defendant was a major participant in a special circumstance felony under section 190.2, subdivision (d), our Supreme Court has identified the following factors for consideration:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  [Fn. omitted.]  What did the defendant do after lethal force was used?  No one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Banks, supra,* 61 Cal.4th at p. 803; accord *Clark, supra,* 63 Cal.4th at p. 611.)

Substantial evidence of several factors relating to petitioner's role in the attempted robberies supports the conclusion that he was a major participant.  Evidence certainly supports the finding that petitioner participated in planning the robbery.  Indeed, the record contains evidence that petitioner first

14

came up with the idea to steal from the Mobil station by suggesting they do a "beer run"—i.e., grab beer and run out of the store without paying for it. When Sanford embellished on petitioner's original plan by suggesting they might as well rob the Mobil station, petitioner not only agreed to do so, but additionally volunteered that he would hold the door open to make sure Sanford could escape.[3] And while we recognize that the Mobil station robbery did not require particularly sophisticated planning, petitioner nonetheless played a significant and relatively equal role vis-à-vis the other participants (namely Sanford and Perez) who contributed to what planning was necessary to accomplish it.

Also, with respect to the planning and execution of the armed robbery, evidence supports the conclusion that petitioner was responsible for making sure that Sanford had the gun. Graeff told the police that petitioner took possession of Sanford's gun and put it in the back of the vehicle when Sanford first joined up with petitioner and his friends. Graeff also told police that, when it came time to prepare for the robbery, petitioner then handed the gun to Sanford. From this, the conclusion may reasonably be drawn that petitioner personally handled the

---

[3]    The idea to hold the door open was important to the robbery plan. The jury heard evidence that Sanford had previously been briefly trapped inside a CVS Pharmacy from which he tried to steal liquor because someone locked the door on him. Similarly, Perez's brother had been trapped in an AM/PM mini-mart during an attempted "beer run" when someone jammed the door shut. Notably, the jury could have found that petitioner fully appreciated the importance of holding the door open because he had been outside the AM/PM when Perez's brother was previously trapped.

15

murder weapon and was responsible for supplying it to the shooter for use in the robbery. Indeed, it is noteworthy that, to do so, petitioner necessarily took the additional deliberate step of retrieving the gun from the back of the vehicle in which it had been stowed away to ensure that Sanford would have it available to execute the planned robbery.

The evidence also supports the conclusion that petitioner possessed awareness of Sanford's dangerousness and careless attitude toward killing. When Sanford approached Perez's vehicle, Sanford told petitioner and the others that he had just shot someone in the head. And although Graeff testified that the vehicle's occupants believed Sanford was kidding, the jury did not have to credit Graeff's personal belief and speculation as to how everyone else—including petitioner—interpreted Sanford's statement. Moreover, even if Sanford had not, in fact, just shot someone,[4] and even if petitioner did not entirely believe Sanford had just done so, Sanford's statement at the very least revealed that petitioner with eyes wide open embarked upon an armed robbery with the type of cohort who callously bragged about having shot another human being moments earlier—indeed, apparently in a kidding manner. From this, the jury could have concluded that petitioner was well aware of the particular

---

[4] Petitioner argues that Sanford's "claim to have shot someone in the head was not shown to be of a character to be taken seriously" because the prosecution did not present evidence that someone in the vicinity of where Sanford entered Perez's vehicle had been shot on the night of the murders. This is beside the point because the relevant focus is on whether petitioner knew Sanford had done so or believed Sanford had done so (whether or not Sanford actually had).

16

dangers posed by arming Sanford for the robbery they jointly planned.

We also find particularly significant in determining petitioner's status as a major participant his physical presence at the scene, involvement in the actual robbery, and inaction either in attempting to prevent the shootings or in assisting the victims. In *Banks, supra,* 61 Cal.4th at page 803, footnote 5, our Supreme Court noted, "In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death. [Citation.] Those not present have no opportunity to dissuade the actual killer, nor to aid the victims, and thus no opportunity to prevent the loss of life. Nor, conversely, are they in a position to take steps that directly and immediately lead to death . . . ." As a corollary, there may be significantly greater culpability for accomplices who are present. In *Tison, supra,* 481 U.S. at page 158, the defendants were found to be major participants because each "was actively involved in every element of the kidnapping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder" of the victims. (See *Banks, supra,* 61 Cal.4th at p. 803, fn. 5 [noting *Tison*'s emphasis on the defendants' "physical presence and active involvement in every step"].)

Here, petitioner went to the Mobil station convenience store with Sanford. He then held the door for Sanford to allow for an escape once the robbery was complete. Petitioner watched Sanford walk up to the register and continued to hold the door open as Sanford demanded money, warned one of the clerks he would shoot, gave that clerk five seconds to turn over the money, and then shot both clerks. When Sanford told the clerk he had

five seconds to give Sanford the money and began counting down, petitioner did not intercede in any way. Instead, by continuing to hold the door for Sanford, petitioner provided safe passage out of the store immediately after the shooting. Further, after Sanford shot both clerks, defendant fled with Sanford to Perez's vehicle and instructed Perez to flee, exclaiming, "Man, just go, just go, just go, just get out of here, man. Just go."

On this record, we conclude there was substantial evidence that petitioner was a major participant. Far from being akin to a minor participant "getaway driver, sitting in a car away from the murder" (*Banks, supra,* 61 Cal.4th at pp. 802-803), petitioner helped plan the robbery, provided the shooter with the gun even after the shooter boasted he had just shot someone in the head, was on scene for the robbery and held the door open to guarantee an escape, stood by watching as the killer counted down to the murder, rendered no assistance to either victim, and instead fled the scene with the murderer while screaming at the getaway driver to "just go." Considering such conduct in its totality, we hold that petitioner falls squarely on the "major participant" side of the *Enmund-Tison* continuum. (Cf. *Banks, supra*, 61 Cal.4th at p. 805 [defendant was not a major participant where he was "absent from the scene" and there was "no evidence" of defendant planning the robbery, "no evidence" of defendant procuring weapons, "no evidence" defendant or the other participants had previously committed any other violent crime, and "no evidence [defendant] saw or heard the shooting . . . or that he had any immediate role in instigating it or could have prevented it"].)

18

2.     Reckless Indifference to Human Life

"[T]he culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death' [citation] . . . ." (*People v. Estrada* (1995) 11 Cal.4th 568, 577.)  "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801.)  "[I]t encompasses a willingness to kill (or to assist in another killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra,* 63 Cal.4th at p. 617.)

Relying on the Model Penal Code definition of acting recklessly,[5] our Supreme Court in *Clark, supra,* 63 Cal.4th at page 617 explained that recklessness has both subjective and objective elements.  "The subjective element is the defendant's conscious disregard of risks known to him or her.  But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky

---

[5]     "The Model Penal Code generally defines acting recklessly as follows:  'A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' (Model Pen. Code § 2.02, subd. (2)(c).)  [Fn. omitted.]" (*Clark, supra,* 63 Cal.4th at p. 617.)

activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' [Citation.]" (*Ibid*.) "[A]lthough the presence of some degree of defendant's subjective awareness of taking a risk is required, it is the jury's objective determination that ultimately determines recklessness." (*Id*. at p. 622.)

Our Supreme Court has identified the following factors to consider in determining whether a defendant acted with reckless indifference to human life: knowledge of weapons, and use and number of weapons; physical presence at the crime and opportunities to restrain the crime and/or aid the victim; duration of the felony; defendant's knowledge of a cohort's likelihood of killing; and the defendant's efforts to minimize the risks of the violence during the felony. (*Clark, supra,* 63 Cal.4th at pp. 618-623.) As with the factors identified in *Banks, supra,* 61 Cal.4th at page 803 for determining major participant status, no one of the factors for determining reckless indifference "'is necessary, nor is any one of them necessarily sufficient.' [Citation.]" (*Clark, supra,* 63 Cal.4th at p. 618.)

Substantial evidence supports the conclusion that petitioner acted with reckless indifference to human life. In this regard, we note that factors demonstrating petitioner's role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference. (*Tison, supra,* 481 U.S. at p. 153 ["These requirements significantly overlap both in this case and in general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life"]; see also *Clark, supra,* 63 Cal.4th at p. 615 [noting *Tison*'s observation that although the requirements are stated separately, "they often overlap"].)

20

As discussed above, more than simply knowing Sanford would use a gun during the robbery, petitioner supplied Sanford with it immediately beforehand. This is a significant factor indicating petitioner's reckless indifference because, as also discussed above, Sanford told petitioner that he had just shot someone in the head, which put petitioner on notice of the increased likelihood of Sanford's willingness to use the gun. Indeed, evidence adduced at trial indicates that petitioner actually harbored concern about Sanford's potential instability and readiness to use the gun, as petitioner wanted Sanford to put away the gun when Sanford initially approached petitioner in Perez's car because Sanford appeared to be "a little jumpy, a little jitterish."

Further, to the extent there is doubt as to petitioner's reckless indifference when he put the gun back into the hands of a jumpy and jittery Sanford before entering the store, any objective observer would have appreciated the grave risk to life once Sanford entered the store and demanded money from the clerk while counting down from five and threatening to shoot. (See *Clark, supra,* 63 Cal.4th at p. 619 [noting reckless indifference of an observing accomplice might be found where "the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force"]; *People v. Smith* (2005) 135 Cal.App.4th 914, 927-928 [a jury may find that a defendant "gained a 'subjective awareness of a grave risk to human life'" during the commission of the crime].) In this regard, it is noteworthy that the shooting was not spontaneous or accidental; rather, Sanford made clear his intent to shoot, which afforded

21

petitioner the time to observe and react before the murder. (Cf. *Banks, supra,* 61 Cal.4th at p. 807 [finding no reckless indifference where the killing "was apparently a spontaneous response to armed resistance from the victim"]; see also *Clark, supra,* 63 Cal.4th at p. 619 [noting that, for a defendant who had the opportunity to "observe his cohorts," it "is fair to conclude that he shared in their actions and mental state"].)

As with petitioner's role as a major participant, we find particularly significant in concluding that petitioner acted with reckless indifference his physical presence at the scene and his failure to make any attempt to prevent the shootings or to assist the victims. In *Clark*, our Supreme Court noted that the United States Supreme Court in *Tison, supra,* 481 U.S. at page 158 "stressed the importance of presence to culpability." (*Clark, supra,* 63 Cal.4th at p. 619.) A defendant who is present has "an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders. [Citation.]" (*Ibid.*) A defendant who is present also has the opportunity to assist the victim. (*Ibid.*)

But petitioner neither intervened to dissuade Sanford from shooting either clerk nor came to either clerk's aid after the shootings. Instead, petitioner manned the escape route while Sanford shot the clerks and then fled to avoid being caught. Petitioner now claims he had no opportunity to intervene in the killings, arguing: "[The] record shows that Sanford demanded money and the male clerk said there was no money because there was a 'drop safe.' Sanford threatened to shoot the clerks, saying, 'I ain't playing,' and telling the clerks they had five seconds. The male clerk replied, 'Shoot me,' and Sanford shot him. This does

22

not show that Sanford actually gave the clerks five seconds so that petitioner had time to intervene."

A rational jury could disagree with petitioner's view of the evidence. During his interview with law enforcement officers, petitioner said Sanford told the clerk that he had five seconds to give Sanford the money. Graeff also testified that Sanford said he had "counted down" before he shot the clerk. Sufficient evidence thus supports the conclusion that Sanford counted down from five to one before shooting the clerks.[6] And in those five seconds, petitioner could have done any number of things to intercede or assist the victims—e.g., yell at Sanford to stop, try to halt the countdown, demand that they leave, distract Sanford, or attempt to calm Sanford, to name a few. But instead petitioner did nothing during that crucial time period other than stand idly by with indifference—with reckless indifference to human life, to be precise.

Finally, petitioner argues that some meaning should be ascribed to his "hysterical" demeanor upon returning to Perez's vehicle after the shootings when he exclaimed: "You just shot them. You just shot them. You just shot them. I can't believe you just shot them." According to petitioner, this reaction "was not consistent with a realization, before the shootings, that Sanford would shoot someone during the robbery." We disagree. Petitioner's reaction to the murder evidences that he may have been surprised Sanford ultimately killed the store clerks, but, as our Supreme Court observed in *Clark*, the majority in *Tison* was unconvinced that the defendants' expressions of "'surprise,

---

[6] Even Sanford testified that the shooter gave the clerk four seconds to get money from the safe—though Sanford testified the shooter was petitioner and not him.

helplessness, and regret' over their father's shooting of the kidnap victim (*Tison, supra,* 481 U.S. at p. 166 [Brennan, J., dissenting])" was necessarily sufficient to prevent a finding of reckless indifference to human life. (*Clark, supra,* 63 Cal.4th at p. 623.)

Here, we must look at the totality of the circumstances. In so doing, we hold that sufficient evidence supports the jury's finding that petitioner's participation in and presence during the armed robbery exhibited a reckless indifference to human life, notwithstanding any surprise he may have exhibited after the fact.

## II.    Procedural Bars

The People argue that petitioner's claim that insufficient evidence supports the jury's robbery/burglary special circumstance findings is procedurally barred because: (1) the claim was raised and rejected on direct appeal (*In re Waltreus* (1965) 62 Cal.2d 218); (2) the claim was raised in a prior petition for writ of habeas corpus and denied (*In re Miller* (1941) 17 Cal.2d 734); and (3) the claim that evidence adduced at trial was insufficient is not cognizable in a habeas petition (*In re Lindley* (1947) 29 Cal.2d 709). Because we agree with the People on the merits—i.e., that sufficient evidence supports the jury's robbery/burglary special circumstance findings—we need not address the People's asserted procedural bars.

24

**DISPOSITION**

The petition for writ of habeas corpus is denied.

CERTIFIED FOR PUBLICATION


KIN, J.*


We concur:


KRIEGLER, Acting P. J.


BAKER, J.

---

*      Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.