Filed 11/7/24  P. v. Logan CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GREGORY LOGAN,<br><br>    Defendant and Appellant. | B335358<br><br>(Los Angeles County<br>Super. Ct. No. A638508-02) |

APPEAL from an order of the Superior Court of Los Angeles County, Pat Connolly, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Gregory Logan, convicted in 1990 of first degree murder and second degree robbery, appeals from the superior court's order following an evidentiary hearing denying his petition for resentencing under Penal Code section 1170.95 (now section 1172.6).[1]  Logan argues substantial evidence did not support the court's finding he is guilty of murder under current law as a major participant in an underlying felony who acted with reckless indifference to human life.  We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Trial Court Convicts Logan of First Degree Murder, and We Affirm*

On the evening of September 24, 1986 Logan, Randolph Hawkins, and Willie Hearod walked to the Hoover Plaza apartments.  Logan and Hawkins left, and Hearod stayed behind to play cards.  Logan and Hawkins saw a Cadillac belonging to Raymond Curtis stopped in the middle of the street with blinking lights.  Hawkins said, "Let's get that car."  When Curtis approached the car, Logan and Hawkins ran toward it.  Hawkins pulled out a gun and told Curtis to freeze.  Curtis dropped the keys, and Logan picked them up.  Hawkins said, "Let's take him with us . . . so he can't call the police and report his car stolen."  Logan said, "All right."  Hawkins and Logan put Curtis in the trunk of the car, drove to an alley behind the Hoover Plaza, and went inside Hearod's apartment.

---

[1]      Statutory references are to the Penal Code.

2

Hawkins told Hearod he had a car and "wanted to go do some robberies." Hearod went outside with Hawkins and Logan. Logan stood near the trunk of the car while Hawkins searched the front seat. Hearod asked Logan where they got the car, and Logan said they took it from a man down the street. Hearod said, "If you just got it down the street, then the police are going to be hot around here, so why don't you all take the car away." Hawkins said, "The police ain't going to be hot around here because we got the man in the trunk." Hearod went back inside.

Logan and Hawkins moved Curtis to the back seat of the car and drove to a dead end near the freeway. Logan let Curtis out of the car. Curtis began to run away, Hawkins chased him, and Curtis fell. Curtis grabbed Hawkins's leg, and Hawkins shot Curtis six to nine times. Logan ran away.

A security guard at a hospital that was closed for construction heard gunshots at 1:00 a.m. When he went outside, he saw Curtis stagger down the street and sit down. The security guard called the 911 emergency operator. Police and paramedics arrived and found Curtis was dead.

Meanwhile, Hawkins picked up Logan, and they returned to the Hoover Plaza. Hawkins asked Hearod to go with them to Santa Monica to "do some robberies," but Hearod wanted to finish playing cards. Hearod asked what happened to Curtis, and Hawkins said that Logan "was going to let the man go, but he's stupid," and that Hawkins did not want to go back to jail. Hawkins told Hearod he shot Curtis six or seven times. He showed Hearod a black .25 caliber automatic gun with a wooden handle, Western-style writing, and a gold design, and opened it to show "he had shot all the bullets out the gun." Hawkins said "a dead man can't testify in court." Logan told Hearod he shot at

Curtis, but Hawkins called Logan a liar and said Logan shot in the air.

Logan and Hawkins drove to Santa Monica and returned to the Hoover Plaza two hours later. Hawkins told Hearod they did not make any money that night. Logan and Hawkins drove to Hawkins's house, where they slept. In the morning Logan and Hawkins drove to the home of Antwanette Jordan and her sister Cynita Boone. Inside the home, Hawkins showed Jordan a silver gun and showed her "how it was used." Logan drove Hawkins and the teenage girls to their high school, stopping at a store on the way. While they were at the store, Boone left her purse in the car, giving Logan and Hawkins an opportunity to put a gun in it.

Police officers saw Logan, Hawkins, and the two teenage girls getting out of Curtis's stolen car outside the school. When the officers approached, Hawkins fled, and Logan walked into the school with Jordan and Boone. The officers apprehended Hawkins and Logan.

Boone later discovered a silver gun in her purse. At lunch Boone showed the gun to Jordan, who recognized it as the gun Hawkins showed her earlier. Boone gave the gun to a friend. Police ultimately recovered the gun. Police also found a black gun with gold writing and a brown wooden handle in Hawkins's bedroom.

A medical examiner from the Los Angeles County Coroner's Office determined Curtis had been shot four times in the back. Two of the gunshot wounds were fatal.

The People charged Logan with first degree murder (§ 187, subd. (a)), kidnapping (§ 207, subd. (a)), kidnapping for robbery (§ 209, subd. (b)), and second degree robbery (§ 211), and alleged

Logan committed murder while he was engaged in the commission of kidnapping (§ 190.2, subd. (a)(17)).  The People also alleged that Logan personally used a firearm, within the meaning of section 12022.5, subdivision (a), and that Logan had a prior serious felony conviction, within the meaning of section 667, subdivision (a).

At Logan's first trial the court granted his motion for judgment of acquittal on the kidnapping and kidnapping for robbery charges.  After closing argument a juror notified the court she had received an anonymous threatening telephone call, and the court declared a mistrial.  The People and Logan agreed to a court trial based on the transcripts and evidence presented at the first trial.  The People agreed to dismiss the kidnapping-murder special-circumstance allegation and to amend the firearm enhancement to principal-armed (§ 12022, subd. (a)), rather than personal use.  (*People v. Logan* (Mar. 7, 2022, B304591) [nonpub. opn.] (*Logan II*).)

The trial court found Logan guilty of first degree murder and second degree robbery.  The court also found true the firearm allegation.  The court sentenced Logan to a prison term of 25 years to life on the murder conviction, plus one year for the firearm enhancement.  The court imposed and stayed execution of a three-year sentence on the robbery conviction.  We affirmed the judgment after Logan's appointed counsel filed an opening brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 raising no issues.  (*People v. Logan* (July 15, 1992, B051646) [nonpub. opn.] (*Logan I*).)

B. *The Superior Court Twice Denies Logan's Petition for Resentencing Under Section 1172.6*

In January 2019 Logan filed a petition for resentencing under section 1172.6, checking boxes on a form petition stating he was eligible for relief and asking the court to appoint counsel to represent him. The superior court appointed counsel, the People filed a written response to the petition, and Logan filed a reply.

Although the superior court did not issue a formal order to show cause, the court scheduled an evidentiary hearing, after which the court denied the petition, ruling Logan "was a major participant and is not eligible for the relief sought." Logan appealed, and we reversed. (*Logan II*, *supra*, B304591.) We held the superior court erred in applying an incorrect evidentiary standard and in failing to make a finding on whether Logan acted with reckless indifference to human life. We directed the superior court to hold a new evidentiary hearing. (*Ibid*.)

At the evidentiary hearing in September 2023, the court stated that, at the previous evidentiary hearing, it found beyond a reasonable doubt Logan was a major participant in the robbery. After considering the evidence in light of the factors articulated by the Supreme Court in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the court found Logan also acted with reckless indifference to human life. The court ruled that Logan "went out with a plan of violence," that both Logan and Hawkins had guns, and that Logan fired his gun. The court also stated that while Curtis was restrained in the trunk, "Mr. Curtis's life was one filled with terror." The court continued: "This was truly a showing of reckless indifference to human life. There was no caring about it, what was going to occur to Mr. Curtis." Finally,

6

regarding Logan's actions after the murder, the court stated: "What do they do afterwards?  They use that car to try and pick up women.  There is no thought about what they had just done." The court denied the petition, and Logan timely appealed.

**DISCUSSION**

A.    *Section 1172.6*

Effective 2019, the Legislature substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Curiel* (2023) 15 Cal.5th 433, 448; *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843) and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957).  Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e).  That provision requires the People to prove specific facts relating to the defendant's culpability:  The defendant was the actual killer (§ 189, subd. (e)(1)); the defendant, though not the actual killer, with the intent to kill assisted in the commission of the murder (§ 189, subd. (e)(2)); or the defendant was a major participant in a felony listed in section 189, subdivision (a), and acted with reckless indifference to human life, "as described in subdivision (d) of

7

Section 190.2," the felony-murder special-circumstance provision (§ 189, subd. (e)(3)).  (See *Curiel*, at p. 448; *Strong*, at p. 708.)

Section 1172.6 authorizes a person convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts, if he or she could not now be convicted of murder because of the changes the Legislature made effective 2019 to the definitions of the crime.  (See *People v. Curiel, supra*, 15 Cal.5th at pp. 449-450; *People v. Strong, supra*, 13 Cal.5th at p. 708; *People v. Lewis, supra*, 11 Cal.5th at p. 957.)  If a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner, if requested.  (*Lewis*, at pp. 962-963; see § 1172.6, subd. (b)(1)(A), (3).)  The prosecutor must then file a response to the petition, the petitioner may file a reply, and the court must hold a hearing to determine whether the petitioner has made a prima facie showing he or she is entitled to relief. (§ 1172.6, subd. (c).)

Where, as here, the petitioner has made a prima facie showing he or she is entitled to relief under section 1172.6, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subd. (d)(1).)  At that hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. (§ 1172.6, subd. (d)(3).)  The petitioner and the prosecutor may also offer new or additional evidence.  (*Ibid*.; see *People v. Gentile, supra*, 10 Cal.5th at pp. 853-854.)

8

On appeal from an order denying a petition under section 1172.6, we review the superior court's factual findings for substantial evidence. (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1066; *People v. Montanez* (2023) 91 Cal.App.5th 245, 270.) "In reviewing the trial court's findings for substantial evidence, we . . . examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt. [Citation.] . . . While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Pittman* (2023) 96 Cal.App.5th 400, 414, internal quotation marks omitted; see *Montanez*, at pp. 270-271.) "''Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.''" (*People v. Navarro* (2021) 12 Cal.5th 285, 339; see *People v. Brooks* (2017) 3 Cal.5th 1, 57; *Montanez*, at p. 271.)

B.  *The Superior Court Did Not Err in Denying Logan's Petition Under Section 1172.6*

1.  *Applicable Law*

Section 189, subdivision (e)(3), provides that a person who participates in one of the felonies listed in section 189, subdivision (a), may be liable for murder if the prosecution proves

9

he or she "'was a major participant in the underlying felony and acted with reckless indifference to human life,'" within the meaning of section 190.2, subdivision (d). (*People v. Curiel*, *supra*, 15 Cal.5th at p. 448; see *People v. Strong*, *supra*, 13 Cal.5th at p. 708; *People v. Gentile*, *supra*, 10 Cal.5th at pp. 842-843.) The Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 "clarified the meaning of the special circumstances statute" (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*)) and identified "a nonexhaustive list of considerations" relevant to whether a defendant was culpable for murder under section 189, subdivision (e)(3) (*Strong*, at pp. 706-707; see *People v. Ramirez* (2021) 71 Cal.App.5th 970, 986).

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" (*Scoggins*, *supra*, 9 Cal.5th at p. 677; see *People v. Keel* (2022) 84 Cal.App.5th 546, 557.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Banks*, *supra*, 61 Cal.4th at p. 808.)

10

To determine whether a defendant acted with reckless indifference to human life under section 190.2, subdivision (d), courts consider, among other factors: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677; see *Clark*, *supra*, 63 Cal.4th at pp. 618-623.) No "'one of these considerations is necessary, nor is any one of them necessarily sufficient.'" (*Clark*, at p. 618.)

> 2.  *Substantial Evidence Supported the Superior Court's Finding Logan Acted with Reckless Indifference to Human Life*

Logan does not challenge the superior court's finding he was a major participant in the underlying felony (here, robbery) within the meaning of section 190.2, subdivision (d). The only issue is whether substantial evidence supported the court's finding Logan acted with reckless indifference to human life. It did.

First, both Logan and Hawkins were armed and fired their weapons. Logan concedes that he had "a gun on him" and that he used it "after letting Curtis go from the trunk." Hearod testified Logan claimed he shot at Curtis (though Hawkins said Logan shot in the air). Logan does not deny he knew Hawkins was

11

armed, and in any event, Hawkins "drew down" on Curtis with a gun when Logan and Hawkins first encountered him. Witnesses saw two different guns: the silver gun Logan or Hawkins put in Boone's purse and the black gun with the wooden handle Hawkins showed Hearod. (See *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 ["defendants were aware they all had firearms and used them during the attempted robbery"]; cf. *Scoggins*, *supra*, 9 Cal.5th at p. 677 [defendant "did not use a gun, nor did he know that a gun would be used during the felony"]; *People v. Keel*, *supra*, 84 Cal.App.5th at p. 559 [defendant's gun was unloaded].)

Second, Logan was physically present during the entire sequence of events leading to Curtis's murder. He and Hawkins put Curtis in the trunk, drove to the Hoover Plaza apartments, and then drove to the dead end where Hawkins shot Curtis. Logan missed several opportunities to restrain Hawkins: He could have agreed to steal Curtis's car but refused to put Curtis in the trunk. He could have released Curtis when he and Hawkins stopped at the Hoover Plaza. Or he could have stayed at the Hoover Plaza with Hearod and declined to continue participating with Hawkins in the crime. (See *Scoggins*, *supra*, 9 Cal.5th at p. 678 ["'"the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts,"'" and if "'"the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders"'"]; *Clark*, *supra*, 63 Cal.4th at p. 619 ["[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps"]; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 593 [defendant "could have

12

rejected the planned crime or could have adjusted the method to take victim welfare into account"].)

And even in the moments before Hawkins shot Curtis, Logan had a final opportunity to restrain Hawkins. When Logan let Curtis out of the car and Hawkins began chasing him, Logan could have yelled at Hawkins to stop. Instead, Logan either shot Curtis or fired his gun in the air. (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1014 [after the defendant's accomplice fired a warning shot, "there was a brief but critical opportunity" for the defendant "to say or do something to deescalate the situation," but "he remained silent"]; *In re Loza* (2017) 10 Cal.App.5th 38, 54 [after the shooter said he would count to five and then shoot, the defendant had five seconds to do "any number of things to intercede or assist the victims—e.g., yell at [the shooter] to stop, try to halt the countdown, demand that they leave, distract [the shooter], or attempt to calm [the shooter], to name a few," but instead the defendant "did nothing during that crucial time period other than stand idly by with indifference—with reckless indifference to human life, to be precise"]; cf. *Scoggins*, *supra*, 9 Cal.5th at p. 678 [defendant "did not arrive at the crime scene until after the shooting occurred," and it was not clear whether he could see the shooting]; *People v. Ramirez*, *supra*, 71 Cal.App.5th at p. 989 [the "attempted carjacking was executed quickly, providing [the defendant] no realistic opportunity to intervene before [the shooter] opened fire"]; *In re Taylor* (2019) 34 Cal.App.5th 543, 559 [defendant "never got out of the car" and "could not even see" the shooter's interaction with the victim].)

Nor did Logan aid Curtis after Hawkins shot him. Logan did not call 911, try to get help, or drive Curtis to a hospital.

13

Instead, he fled the scene, leaving Curtis to die at the dead end of a dark street, and later reconvened with Hawkins to commit more robberies in Curtis's car. (See *In re Loza*, *supra*, 10 Cal.App.5th at p. 54 [defendant's failure to aid the victim after the shooting and his subsequent flight supported the finding the defendant acted with reckless indifference to human life]; cf. *Scoggins*, *supra*, 9 Cal.5th at p. 672 [after the shooting the defendant "walked over to [the victim] and checked if [he] was still breathing"]; *People v. Ramirez*, *supra*, 71 Cal.App.5th at pp. 978, 990 [after the shooting the defendant fled with a confederate, who told the shooter he had "made a mess of things" and "'[y]ou're on your own'"].)[2]

Third, the duration of the crime supported the superior court's finding Logan acted with reckless indifference to human life. Although Logan and Hawkins did not hold Curtis for hours, they did not merely steal his car at gunpoint and drive away. Instead, they placed him in the trunk, drove him to the Hoover Plaza, moved him to the back seat, and drove him to a dead end street, where Hawkins shot him. The multiple interactions with Curtis at different times and in different locations increased the risk of violence. (See *Clark*, *supra*, 63 Cal.4th at p. 620 [where "a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a

---

[2] In his reply brief Logan argues that he could not call 911 because cellphones were not available in 1986 and that "there was help nearby" because he and Hawkins left Curtis 322 feet from a hospital. But Logan did not look for a phone to call 911 or call from Hearod's apartment. Nor is there any evidence that Logan knew a hospital was nearby or that he went to the hospital (which, according to the security guard who heard the gunshots, was closed for construction anyway) to seek help.

14

greater window of opportunity for violence'"]; cf. *People v. Underwood* (2024) 99 Cal.App.5th 303, 318 [only a few minutes passed between the time the defendant and the killer approached the victim and the time they fled].)

Fourth, Logan did not do anything to minimize the risk of violence during the robbery. Logan brought a loaded gun and knew Hawkins had a gun. Although Hawkins was the instigator, Logan went along with Hawkins's increasingly dangerous conduct, from stealing Curtis's car, to putting Curtis in the trunk, to driving him to an isolated area. (See *In re Harper* (2022) 76 Cal.App.5th 450, 466 [although the defendant "may not have had the opportunity to minimize the risk of violence during the planning stage, he did nothing to minimize the risk of violence when it became clear the original plan had unraveled"]; cf. *Scoggins, supra,* 9 Cal.5th at p. 683 [defendant planned an unarmed robbery in a public parking lot during the daytime, when witnesses might be present].)[3]

Logan argues he did not act with reckless indifference to human life because, when he let Curtis out of the car, he intended to let him go. Logan argues that he believed the plan was to release Curtis, take his car, and commit more robberies and that he could not have anticipated Hawkins would shoot Curtis. Logan points to Hawkins's statement Logan "was going to let the man go, but he's stupid," which the superior court

---

[3] The fifth factor, Logan's knowledge Hawkins was likely to use lethal force, neither supports nor undermines the superior court's finding Logan acted with reckless indifference to human life. It is not clear from the record what Logan knew about Hawkins's propensity to kill.

15

described as "the most compelling" evidence in favor of finding Logan did not act with reckless indifference to human life.

Reckless indifference "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) Even if Logan did not intend to kill Curtis, his conduct during the robbery supported the superior court's finding he was willing to assist Hawkins in killing Curtis to get Curtis's car and use it to commit robberies. While Logan may not have intended that he or Hawkins would kill Curtis, "the evidence concerning the manner in which they carried out the robbery is sufficiently weighty to support" (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1090) the superior court's finding Logan acted in reckless disregard for human life.

Logan also argues "nothing [he] could have done would have stopped" Hawkins from killing Curtis. Logan relies on the following statement by the superior court: "I don't believe that Mr. Hawkins could have been stopped. I think that once they put Mr. Curtis in that trunk, he was going to die." However, in determining whether Logan acted with reckless indifference to human life, the issue is not whether Logan could have stopped Hawkins from killing Curtis, but whether Logan was "'willingly involved in the violent manner'" of the crime and consciously disregarded "'the significant risk'" Curtis would die. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) The decision by Hawkins and Logan to put Curtis in the trunk significantly increased the risk of death to Curtis. And there is no evidence that, once Curtis was in the trunk, Logan tried to stop Hawkins from killing him, regardless of whether Logan would have succeeded. As the

16

superior court stated, "I don't think that the reality of the situation is [Logan] could have stopped [Hawkins]. . . .  But I also don't believe that he cared to stop him."

## DISPOSITION

The order is affirmed.  The People's request for judicial notice of the clerk's transcript in Logan's direct appeal is granted.

SEGAL, Acting P. J.

We concur:

FEUER, J.

STONE, J.