Filed 10/3/24  P. v. Wells CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STANLEY WELLS,<br><br>    Defendant and Appellant. | B328860<br><br>(Los Angeles County<br>Super. Ct. No. A018193-01) |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed.

Winston McKesson, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## *INTRODUCTION*

Stanley Wells, who was convicted in 1978 of first degree felony murder, appeals from the trial court's order following an evidentiary hearing denying his petition for resentencing under Penal Code section 1172.6 (former section 1170.95).[1] Wells argues substantial evidence did not support the court's ruling he could still be convicted of murder as a major participant in an underlying felony who acted with reckless indifference to human life. We affirm.

## *FACTUAL BACKGROUND*[2]

On September 6, 1977, around 6:00 p.m., Toni McDowell spoke with her 90-year-old mother, Gladys Ott, over the phone. Around 5:00 p.m. the next day, McDowell went to Ott's one-bedroom apartment. McDowell used a key to unlock the front door. When she went inside, the apartment was in "shambles."

McDowell found Ott lying naked on the bed in the bedroom. Ott did not have a pulse and appeared to be dead. The left side of Ott's face was "completely black." McDowell noticed that items, including a television and a toaster, were missing from the apartment.

---

[1] Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.) All undesignated statutory references are to the Penal Code.

[2] We derive the facts from the testimony and admitted exhibits at Wells's trial. The People introduced into evidence the trial transcripts and exhibits at Wells's section 1172.6 evidentiary hearing. The People also introduced the prior appellate opinion, but there is no indication in the record that the trial court relied on the opinion in making its ruling.

Shortly after, police officers arrived at Ott's apartment. The apartment was in "an extreme state of disarray." Closets and drawers in every room of the apartment had been "ransacked." The kitchen window was open and the screen was removed, suggesting the window may have been a point of entry. There were footprints outside the kitchen window.

Ott was lying on a bed in the bedroom. Her nightgown was pulled up over her torso. A blanket was pulled up between Ott's legs, and there was a rag wrapped around her neck. Ott was "badly bruised" on her face and chest. A wine bottle, with what appeared to be a pubic hair on the neck of the bottle, was on the floor next to the bed.

Dr. Michael Breton, an expert forensic pathologist, conducted Ott's autopsy and opined that Ott died from "asphyxia due to or as a consequence of manual strangulation." The autopsy report noted Ott had contusions on her hands; a fractured sternum; a broken jaw; considerable hemorrhaging to the front of the neck and throat; a large contusion covering the left side of the face, neck, shoulder, and upper chest; lacerations inside the mouth and jaw; multiple rib fractures on both sides of the body; slight hemorrhaging inside the vagina; and two tears inside the vagina.

In a recorded police interview,[3] Wells admitted he burglarized Ott's apartment along with Earl Lloyd Jackson and

---

[3] On appeal, Wells asserts, without any legal argument, that his recorded police interview was "unconstitutional." Because Wells failed to present meaningful legal analysis, this claim " 'requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Further, at the section 1172.6 evidentiary hearing, Wells failed to object to the introduction of

Anthony Smith.[4]  Wells said that Jackson, who lived in the same apartment building as Ott, told Wells and Smith that he knew where to get "a new color T.V."  Jackson then brought them to Ott's apartment.  While they were outside Ott's apartment, they tried "to figure out how to get in."  After spotting a window, Wells helped remove the window screen and lifted one of his accomplices through the window.  While the accomplice was inside, Wells "stood guard."  The accomplice then opened the apartment door, allowing Wells and the third person to enter.

Once inside, Wells removed a television and carried it outside to an alley.  Wells went back inside the apartment to look for more items to steal.  He took some jewelry and vacuum cleaner parts.  Wells and his accomplices were inside the apartment for about 35 minutes before Ott woke up.

The three men then entered the bedroom, where Ott was in bed.  Wells asked Ott where her money was, but Ott did not respond.  Jackson hit Ott repeatedly in the stomach and face, while periodically stopping to ask Ott where the money was.  Ott was making noise but was not responding to the question.  Meanwhile, Wells was rummaging through the bedroom closet.  At some point, Wells told Jackson to stop hitting Ott and that there was a "better way than hitting [her]":  they could put a

the interview transcript.  He also relied on the transcript in making his argument.  Thus, his claim is forfeited on appeal. (See *People v. Trujillo* (2015) 60 Cal.4th 850, 856.)

[4]     At the time of the burglary, Wells was 17 years old, Jackson was 19 years old, and Smith was 15 years old.

hand over her mouth.[5]  However, Jackson did not listen and continued to beat Ott.

Wells, Smith, and Jackson eventually left the apartment. Jackson suggested going back inside because he believed Ott had money or checks.  Although he did not want to return, Wells acquiesced and went back inside the apartment with Jackson. When he entered the bedroom, he saw Ott's face was purple and "real" swollen.  Ott sounded like she was having trouble breathing and like she had blood stuck in her throat.  Jackson pulled up the blankets on Ott's bed, and Wells saw a green bottle between Ott's legs.  Wells became afraid and wanted to leave, but he stayed while Jackson kept looking around the apartment for items to steal.  Jackson rummaged around for 10 minutes, and then they left.

### *PROCEDURAL BACKGROUND*

In 1978, following a court trial, the court found Wells guilty of first degree felony murder.  This District affirmed the judgment on appeal.  (*People v. Wells* (Jan. 30, 1979, 2d Crim. No. 33297) [nonpub. opn.].)

In 2019, Wells filed a petition for resentencing under former section 1170.95.  The People opposed on the ground that Wells was not entitled to relief because he was a major participant in the underlying burglary who acted with reckless indifference to human life.

The court issued an order to show cause and conducted an evidentiary hearing.  At the hearing, the parties relied on

---

[5]     Wells did not elaborate on what he meant by a "better way."  Officer Wren, one of the officers who interviewed Wells, confirmed that Wells did not provide further clarification.

5

excerpts from the trial transcript, the autopsy report, and a transcript of Wells's recorded police interview. No live witnesses were called.

The court denied the petition, finding beyond a reasonable doubt Wells was guilty of felony murder under current law as a major participant in the underlying burglary who acted with reckless indifference to human life. The court reasoned Wells was a major participant in the burglary because: (1) "[Wells] had a role in planning the crime"; (2) "[Wells] suggested the weapon of the hands over [Ott's] mouth, which is ultimately the way that she died"; (3) Wells was aware of the danger of burglarizing a home at night when a "highly vulnerable victim" was present; (4) Wells was present while Ott was being beaten and "he gave the advice to put the hands over her mouth"; and (5) Wells failed to render aid at any point.

The court found Wells acted with reckless indifference to human life because: (1) Wells was present at the scene and instead of stopping the beating, Wells "advised the defendant how to, quote 'quiet her,' go in a different way which ended up being what killed her"; (2) the duration of the burglary gave Wells "plenty of time to try to mitigate the codefendant's actions"; (3) Wells was aware his codefendant was going to kill Ott, given that "[nobody], even at the age of 17, would think that a 90-year-old woman would survive the type of beating that this woman suffered"; and (4) Wells did not try to minimize the harm. The court concluded that all but one of the factors (the first—knowledge of weapons used) weighed in favor of finding Wells acted with reckless indifference to human life.

Regarding Wells's age at the time of the murder (17 years old), the court stated, "We can all say, 'Well, he is 17 and he

6

didn't know or didn't have the courage to call the police.' Okay. But he certainly had the wherewithal to grab his buddy and take him and haul him off this woman. . . . That was within his abilities as a 17-year-old, and he did not."

Wells timely appealed.

## DISCUSSION

1. ***Section 1172.6***

Effective 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437) substantially modified the law governing accomplice liability for murder. (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*); *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*).) Relevant here, it narrowed the felony-murder rule by adding section 189, subdivision (e) to the Penal Code. (*Curiel*, at p. 448.) Under that provision, "[a] participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

SB 1437 also provided a procedure in section 1172.6 for a person convicted of felony murder to petition the trial court to vacate the conviction and be resentenced on any remaining counts if the person could not now be convicted of murder because of the changes to section 189. (§ 1172.6, subd. (a).) The resentencing procedure begins with the filing of a petition

7

containing a declaration that all requirements for eligibility are met.  (§ 1172.6, subd. (b)(1)(A); *Strong, supra,* 13 Cal.5th at p. 708.)  The trial court must then determine whether the petitioner has made a prima facie showing that he or she is entitled to relief.  (§ 1172.6, subds. (a)-(c); *Strong,* at p. 708.)

If the petitioner has made a prima facie showing he or she is entitled to relief under section 1172.6, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts.  (§ 1172.6, subd. (d)(1).)  At the evidentiary hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony.  (§ 1172.6, subd. (d)(3).)  The petitioner and the prosecutor may also offer new or additional evidence.  (*Ibid.*)

On appeal from an order denying a petition under section 1172.6, we apply the substantial evidence standard of review.  (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270 (*Montanez*); *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.)  " '[W]e . . . " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt." ' "  [ ]  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' "  (*People v. Pittman* (2023) 96 Cal.App.5th

400, 414; *Montanez*, at pp. 270-271.)  " ' "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' "  (*People v. Navarro* (2021) 12 Cal.5th 285, 339; *Montanez*, at p. 271.)

2. ***Substantial Evidence Supported the Finding Wells Is Not Entitled to Relief Under Section 1172.6***

A. **Relevant Legal Principles**

A participant in the perpetration of certain enumerated felonies, including burglary, may be liable for murder if the People prove he or she "was a major participant in the underlying felony and acted with reckless indifference to human life," within the meaning of section 190.2, the special circumstances statute. (§ 189, subds. (a), (e); *Strong*, *supra*, 13 Cal.5th at p. 708.)  Our Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) "clarified the meaning of the special circumstances statute" (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*)) and identified a "nonexhaustive" list of factors or considerations relevant to determining whether a defendant is liable for murder under section 189, subdivision (e)(3) (see *Strong*, at pp. 706-707).  "No one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Banks*, at p. 803; accord, *Clark*, at p. 618.)  Instead, determining a defendant's culpability for felony murder requires a "fact-intensive, individualized inquiry" into "the totality of the circumstances."  (*Scoggins*, at pp. 677, 683.)

In *Banks*, the Supreme Court identified the following factors courts must consider in determining whether a defendant is a major participant:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal

9

weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted; accord, *Clark*, *supra*, 63 Cal.4th at p. 611.)

In *Clark*, the Supreme Court specified the relevant factors in determining whether a defendant acted with reckless indifference to human life.  The court observed these factors " 'significantly overlap' " with the major participant factors because " 'the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.) The factors include: "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677, citing *Clark*, at pp. 618-623.)

"In addition to the *Banks* and *Clark* factors, a defendant's youthful age must be considered" in determining whether the defendant had a reckless indifference for human life.  (*People v.*

10

*Jones* (2022) 86 Cal.App.5th 1076, 1088, fn. 7; accord, *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987 [" 'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life' "].) This is because the " ' "hallmark features" ' " of youth, including " ' "immaturity, impetuosity, and failure to appreciate risks and consequences," ' " bear directly on the youth's mental state. (*Ramirez*, at p. 991.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) "Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 676.)

B. **Substantial Evidence Supported the Finding Wells Was a Major Participant**

Substantial evidence supports the trial court's finding Wells was a major participant in the underlying burglary. While Wells did not supply or use a lethal weapon, all the remaining *Banks* factors weigh in favor of the court's finding.

Although Jackson came up with the idea to burglarize Ott's apartment, Wells played a role in planning the logistics. Wells

stood outside the apartment with Jackson and Smith, and the three of them "figure[d] out how to get in."  Their entrance then involved multiple steps:  Wells removed a window screen, lifted his accomplice through the window, and "stood guard" while the accomplice opened the front door.  The court could reasonably infer that Wells, Jackson, and Smith planned each step of the break-in and had equal roles in planning it.  (See *In re Loza* (2017) 10 Cal.App.5th 38, 49 [while robbery "did not require particularly sophisticated planning, petitioner nonetheless played a significant and relatively equal role vis-à-vis the other participants"].)

Although there is no evidence Wells knew *before* he broke into Ott's apartment what particular dangers the burglary posed, the "warning signs that the crime[] posed a serious risk of danger . . . accumulated as the crime[] unfolded."  (*Montanez, supra*, 91 Cal.App.5th at p. 273.)  As soon as Wells entered Ott's bedroom, he saw that a very elderly woman was home in bed.  He then saw Jackson repeatedly beat her on her face and stomach.  Further, he saw the brutal aftermath of the beating when Ott was still alive, but her face was purple and "real" swollen, a bottle was between her legs, and she was struggling to breathe.  Given what Wells witnessed, he plainly was aware while the burglary was still in progress that there was a grave risk Ott would die.  (See *In re Harper* (2022) 76 Cal.App.5th 450, 461 (*Harper*) [substantial evidence supported major participant finding where defendant "was clearly aware of the risk of death once the robbery was underway"].)

In addition, Wells "was physically present at every stage of the crime":  planning, execution, and flight.  (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 592 (*Mitchell*); see *id.* at p. 591

12

[defendant's physical presence "on the scene from start to finish" supported major participant finding]; see also *In re Loza, supra,* 10 Cal.App.5th at pp. 50-51 ["there may be significantly greater culpability for accomplices who are present"]; cf. *Banks, supra,* 61 Cal.4th at p. 803, fn. 5 ["In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death."].) Wells's presence in the bedroom during and after the beating put him in a position to aid Ott and prevent her murder. While Wells argues he was not in the bedroom during the entire beating, Ott lived in a one-bedroom apartment. Thus, even if Wells left Ott's bedroom at some point, the trial court reasonably deduced Wells would have heard the sounds that went along with the severe beating of Ott. Yet Wells made no attempt to help her. Instead, by suggesting there was a "better way" and directing Jackson to put a hand over Ott's mouth, Wells escalated the violence. As the trial court reasonably inferred, Wells "recommend[ed] how to kill her."

Wells argues that his suggestion to put a hand over Ott's mouth should be interpreted as an attempt to help Ott, not kill her. Wells misunderstands our role in a substantial evidence review. We do not reweigh the facts. Rather, " 'we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [superior court] could reasonably have deduced from the evidence.' " (*People v. Cody* (2023) 92 Cal.App.5th 87, 113.) Further, considering what happened after Wells suggested Jackson put a hand over Ott's mouth, it was reasonable for the court to deduce that Wells's suggestion encouraged Ott's murder. Wells also did nothing after Jackson initially ignored Wells's suggestion and continued to beat Ott.

13

Wells also failed to act after returning to Ott's apartment and seeing that Ott was on the brink of death— struggling to breathe and making gurgling noises, with her face swollen and purple. "Had he cared about the victim's well-being, [Wells] could have shown it." (*Mitchell*, *supra*, 81 Cal.App.5th at p. 593.)

Substantial evidence supported the court's finding that Wells was a major participant in the burglary.

C. **Substantial Evidence Supported the Finding Wells Acted with Reckless Indifference**

Substantial evidence similarly supports the trial court's finding Wells acted with reckless indifference to human life during the burglary. All the *Clark* factors except the "[k]nowledge of weapons, and use and number of weapons" (*Clark*, *supra*, 63 Cal.4th at pp. 618-619), weigh in favor of the court's finding (see *id.* at p. 618 [no single factor is necessary]).

Wells's physical presence at every step leading up to the murder and his indifference to Jackson's violence upon a particularly vulnerable victim weigh heavily against Wells. (See *Clark*, *supra*, 63 Cal.4th at p. 619 ["Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force"].)

In addition, the murder took place "at the end of a prolonged period of restraint of the victim," creating a " 'greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at pp. 620-621.) Wells ransacked the apartment for 35 minutes before Ott woke up. Then, Wells was inside the bedroom while Jackson beat

14

Ott.  Because Ott had extensive injuries all over her body, the court could infer that the period of violence against Ott "was not short."  (See *People v. Cody*, *supra*, 92 Cal.App.5th at p. 114 [reckless indifference finding supported where "the underlying burglary/robbery was not short" as evidenced by the "ransacked condition" of the victim's home and the victim's bound hands and feet and defensive wounds].)  Wells then returned to the apartment for 10 minutes where he observed Ott's condition and his accomplice further ransacked the apartment.  The 45-minute duration of the entire incident, which included close interaction by Wells with Ott, suggests Wells acted with reckless indifference.  (See *Montanez*, *supra*, 91 Cal.App.5th at p. 283 [duration of felony supported finding of reckless indifference where victims were bound, and incident lasted approximately 25 minutes].)

Wells contends there is no evidence he knew Jackson would act violently during the burglary, but as discussed, Jackson's violence became apparent once the burglary was underway and there was still an opportunity for Wells to intervene or extricate himself.  In addition, the trial court reasonably determined Wells did not make efforts to minimize the risks of violence during the felony.  (*Clark*, *supra*, 63 Cal.4th at p. 622.)  While Wells contends he told Jackson to stop beating Ott and offered a "better way" than beating her, as discussed, Wells merely suggested an alternative form of violence—similar to the one Jackson used to kill Ott.  Moreover, even if Wells initially intended to minimize the violence, his subsequent actions confirm he was not concerned about the grave risk of death to Ott.  (See *Harper*, *supra*, 76 Cal.App.5th at p. 466 [although the defendant "may not have had the opportunity to minimize the risk of violence during

the planning stage, he did nothing to minimize the risk of violence when it became clear the original plan had unraveled"].)

Lastly, substantial evidence supports the court's finding that Wells's youth does not outweigh all the other factors supporting the conclusion he acted with reckless indifference to human life. Wells argues that as a 17 year old, he "did not know how to properly respond to what was happening." However, other than the fact that Wells was a minor, the record is devoid of any evidence that his youth affected his understanding of the risk of death or made him vulnerable to peer pressure. (Cf. *People v. Ramirez*, *supra*, 71 Cal.App.5th at p. 991 [that the defendant "was influenced by peer pressure" and "was afraid" of the consequences if he did not aid the shooter "may well have affected his calculation of the risk of death posed by using the firearm in the carjacking"].) In recounting the story of the murder, Wells did not express any fear of his accomplices or misunderstanding of the dire condition that Ott was in. (See *Mitchell*, *supra*, 81 Cal.App.5th at p. 595 ["every 18 year old understands bullet wounds require attention"].) Although Wells's youth is a factor for consideration, it "cannot overwhelm all other factors." (*Ibid*.) The other factors, when considered together, substantially support the court's findings that Wells consciously disregarded " 'the significant risk of death' " his actions created and that his conduct grossly deviated from the standard of conduct of a law-abiding person. (See *Scoggins*, *supra*, 9 Cal.5th at p. 677.)

/ / /

16

### DISPOSITION

We affirm the trial court's order denying Wells's petition under section 1172.6.

STONE, J.

We concur:

MARTINEZ, P. J.

SEGAL, J.