# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

LOUIS SANCHEZ EMANUEL,
Defendant and Appellant.

S280551

Sixth Appellate District
H049147

Santa Clara County Superior Court
C1246799

---

June 2, 2025

Justice Evans authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Jenkins concurred.

---

PEOPLE v. EMANUEL

S280551


Opinion of the Court by Evans, J.


Defendant Louis Sanchez Emanuel was convicted of first degree murder following a fatal shooting committed by his codefendant, Jacob Craig Whitley. The conviction was obtained under the felony-murder rule, as the killing occurred during the commission of a robbery perpetrated by Whitley and Emanuel. Under the felony-murder doctrine applicable at the time of his trial and conviction, Emanuel could be found guilty of the crime of murder if a jury found that he committed an inherently dangerous felony, such as robbery, and an accomplice killed someone during the commission of that crime. The only mens rea finding required to support a conviction was the intent to commit the underlying felony.

Subsequently, the Legislature significantly narrowed the scope of the felony-murder rule in Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) (Stats. 2018, ch. 1015, § 3). A felony-murder conviction may no longer rest on the mere commission of and intent to commit an underlying felony. If a defendant was not the actual killer or an aider and abettor acting with intent to kill, the statute now requires that the defendant be a major participant in the felony who acted with reckless indifference to human life. (Penal Code § 189, subd. (e)(3).)[1] With the enactment of Senate Bill No. 1437, the

---

[1] All unspecified statutory references are to the Penal Code.

Legislature also created a vehicle for defendants previously convicted of murder under the broader and now invalidated felony-murder rule to petition for resentencing. (Former § 1170.95, added by Stats. 2018, ch. 1015, § 4, subsequently renumbered as § 1172.6 by Stats. 2022, ch. 58, § 10.)

Emanuel filed a petition for resentencing, arguing he was no longer liable for murder under the more circumscribed felony-murder rule. The trial court denied his petition, finding that Emanuel was a major participant in the robbery who acted with reckless indifference to human life. The Court of Appeal affirmed. (*People v. Emanuel* (May 12, 2023, H049147) [nonpub. opn.] (*Emanuel*).) Because we find the evidence insufficient to support a finding that Emanuel acted with reckless indifference to human life, we reverse the judgment of the Court of Appeal with instructions to remand the case to the trial court for further proceedings on Emanuel's resentencing petition.

## I. BACKGROUND

### A. Statement of Facts

Approximately two weeks before the robbery, Whitley and Emanuel encountered Mansour Amini on his community college campus. The men had never met before. Whitley identified himself as Louis and Emanuel identified himself only as Whitley's cousin. Whitley and Emanuel stated, untruthfully, that they were from Las Vegas. They told Amini they were looking to buy a pound of marijuana. Amini said he could supply the same but would need a couple weeks. Amini and Emanuel exchanged phone numbers.

Over the next few days, Whitley and Emanuel contacted Amini multiple times to inquire about the pound of marijuana. Amini reached out to his friend, John Cody Sonenberg, who had

sold him marijuana on prior occasions. Sonenberg said he could supply a pound of marijuana and offered Amini a $200 commission for brokering the deal.

At some point during this period, Amini and Sonenberg met Whitley and Emanuel in a parking lot outside a Panda Express to show them a sample of marijuana. Whitley and Emanuel stated that they planned to ship the marijuana to their uncle in Las Vegas. They offered to pay $2,200 for the pound. Amini understood that a pound typically sold for about $1,800 and was "confused" why Whitley and Emanuel offered a higher price without attempting to negotiate.

Two or three days later, Amini and Sonenberg again met Whitley and Emanuel outside the Panda Express. Sonenberg did not have the marijuana, so he drove the group to his supplier's house. Sonenberg did not have money to purchase directly from his supplier; instead, he asked Whitley and Emanuel to give him the money up front so he could go inside and make the purchase. Whitley and Emanuel professed not to have the money with them. They asked to meet Sonenberg's supplier. Sonenberg exited and returned about five to ten minutes later, saying his supplier refused to meet them. Whitley and Emanuel suggested postponing the sale, with the understanding that Sonenberg would come to the next meeting with the marijuana and they would come with the money. The group agreed to meet the following day, December 11, 2012, at Cherry Park in San Jose.

On December 11, Sonenberg and Amini argued by text and phone for much of the morning. Sonenberg eventually collected Amini in his truck and the pair drove to Cherry Park. They arrived around 2:30 p.m. While sitting in the truck, Sonenberg

showed Amini a shoebox containing the marijuana. Amini called Whitley and Emanuel, who said they were nearby and on their way. While waiting for them to arrive, Sonenberg and Amini again began to argue. According to Amini, he and Sonenberg planned to work out and smoke a blunt he was rolling from his personal stash of marijuana, but disagreed about whether they should smoke before or after they arrived at the gym. Sonenberg opened the passenger door to his truck and threw out Amini's gym bag, spilling the marijuana he was rolling. Both men got out of the truck, and Sonenberg "got in [Amini's] face." Sonenberg then got back in his truck and drove away, leaving Amini. Amini called and texted Sonenberg but received no reply. He also called and texted Whitley and Emanuel but received no reply.

Sonenberg texted Emanuel at 3:06 p.m., stating: "I be at the park right now with it. We can do this without this fool [Amini]. I'll get you for 21 instead of 22." Based on witness testimony, the shooting occurred at approximately 3:15 p.m. on a residential street abutting Cherry Park. Witnesses reported hearing a gunshot immediately followed by screeching tires. One witness walking her dog in the park noticed a white truck moving very fast "perpendicular to the street." A man fell from the truck and rolled into the gutter. She called 911. Another witness who lived on the street where the incident occurred heard screeching tires followed by a loud bang. She exited her home and saw a truck on the sidewalk with its tailgate against a tree and a man lying face down on the ground. She returned inside to retrieve her cell phone and called 911. While on the phone, she approached Sonenberg and told him help was on the way. Sonenberg moaned but did not respond with words.

The police dispatch went out at 3:20 p.m. Sirens could be heard shortly thereafter. First responders were less than a mile away at the time of the dispatch and arrived on the scene within "only a couple minutes." Police and fire personnel found Sonenberg's truck with its engine still running and the driver side door locked. They were able to gain entry to the truck through the passenger door. Officers found blood in the vehicle as well as on the right front tire and bumper. They found only an unusable amount of marijuana inside the truck.

An accident reconstruction expert opined that Sonenberg's truck suddenly and violently lurched backward with enough force to throw his body out the passenger door. After falling, Sonenberg's body was caught underneath the truck and dragged until it came to rest against the curb. A forensic pathologist testified that Sonenberg died at the scene from a "close-range" gunshot wound to the right side of his neck that perforated his carotid artery. Sonenberg would have lost consciousness within minutes of this injury. Based on gunpowder stippling on Sonenberg's face, the barrel of the gun was within three feet when it was fired. Sonenberg also had an abrasion on his forehead consistent with blunt force trauma.

Breanna Santos is Emanuel's former girlfriend and the mother of his minor son. Emanuel often cared for his son while Santos was at work. Santos testified at the trial in May 2015 that she recalled being interviewed by the police about the events surrounding Sonenberg's murder on at least two occasions in December 2012. However, she claimed not to recall what she said to the police during those interviews or the events of the day of the shooting. Following a hearing outside the presence of the jury, the trial court found her inability to recall disingenuous. The court permitted a police officer who had

5

interviewed Santos, San Jose Police Sergeant Stewart Davies, to testify about Santos's prior statements.

Sergeant Davies testified that he interviewed Santos on December 12 and again on December 14, 2012. On December 12, Santos contacted the police and then appeared at the station for an interview. Santos explained that she wanted to talk to the police because Emanuel had a cell phone registered in her name, which Whitley had borrowed. Whitley had used the phone to "set something up" and "there would be text messages on [it] that would cause the police to come looking for her." Santos told Sergeant Davies that she dropped off her son at Emanuel's house on December 11. When she returned later that afternoon to pick him up, Whitley was there. Whitley told her he had "shot a white boy" at Cherry Park, repeating " 'I shot him' " three times. Emanuel confirmed that Whitley was telling the truth.

The police asked Santos to return for a second interview on December 14. Based on their investigation, officers believed Santos had lied during her first interview. After the police confronted Santos with cell phone records, she admitted that Emanuel had been using his phone to communicate with her on December 11 and gave the account that follows.

Santos stated that she received a phone call from Emanuel at 3:20 p.m., which she did not answer, and another at 3:29 p.m., wherein Emanuel asked her to come pick up their son. Santos left work at around 4:30 p.m. and arrived at Emanuel's house around 5:00 or 5:30 p.m. When Santos arrived at the house, she noticed Emanuel had cut his hair, removing the dreads he wore earlier in the day.

Emanuel told Santos that he and Whitley had gone to get "'some weed.'" According to Santos, Emanuel said: "'[Sonenberg] wasn't trying to give it up.' So I left. And when I was walking away, [Whitley] hit him'" but Sonenberg "'didn't, I guess, get knocked out.'" Whitley said he aimed the gun at Sonenberg's leg, but Sonenberg pushed it up. Whitley fired, and Sonenberg fell to the ground. When Santos asked why Whitley shot Sonenberg, Whitley replied, "'I don't know. I don't know. I shot him.'" Whitley told Emanuel he got rid of the gun and the clothes he had been wearing.

Santos began to panic when Emanuel said the phone would lead back to her. She asked what they had gotten her into, at which point Emanuel "started crying and saying that, 'I didn't do nothing though. I didn't do nothing. And [Whitley] was the one who shot him.'" Whitley and Emanuel said they got rid of the phone. They urged Santos to report the phone lost, but she refused. Later, Emanuel told Santos to tell the police that Whitley had borrowed the phone.

After Santos gave this account once, Sergeant Davies asked her to repeat it, taking care to specify who told her what. Santos repeated that Emanuel said Whitley "set something up" to meet a guy at Cherry Park to "get some weed." Santos told Sergeant Davies: "And he goes, the dude . . . wasn't trying to give it up. So I just told [Whitley], let's go, but he wouldn't come on. He . . . wouldn't like, you know, let go, so [Whitley] hit him with the gun. And [Whitley] said he hit him on the head with the gun. He didn't get knocked out. The guy started fighting back and [Whitley] pointed the gun. And [Whitley] said he pointing [*sic*] the gun down, he was trying to aim down, but the guy hit his hand, it went up and [Whitley] pulled the trigger and

he said he shot him in his neck."[2]  Emanuel told Santos that, after the shooting, he asked Whitley, " 'What the fuck you doing?' "  Emanuel "started panicking" and went home.

Destinee Kindle testified at the trial.  According to her, she and Whitley had an "on-again/off-again" romantic relationship in December 2012.  She testified that on the evening of December 11, Whitley called and asked her to pick him up at Emanuel's house.  Whitley showed Kindle a news story about the shooting and said he and Emanuel were involved.  Whitley told Kindle that he was "trying to rob the boy of some weed" and accidentally shot him in the neck while aiming for his foot.

### B. Procedural History

The Santa Clara County District Attorney charged Emanuel with one count of first degree murder.  (§ 187.)  At the time of Emanuel's trial and conviction, felony-murder liability could be imposed if a jury found the defendant committed or attempted to commit an inherently dangerous felony, such as robbery, and an accomplice killed someone during the commission of the felony.  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654.)  "Felony-murder liability [did] not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony."  (*Ibid.*)  In May 2015, following a joint trial with Whitley, a jury found Emanuel guilty of first degree felony murder.  The jury found Whitley guilty of the same

---

[2]     Despite Sergeant Davies' effort to achieve clarity, it is not always clear in Santos's account whether Emanuel or Whitley was the speaker.  Santos may have been attributing certain statements to Whitley, or she may have been attributing statements to Emanuel, who was relaying to Santos statements Whitley had made to him earlier in the day.

offense, with the additional finding that he personally discharged a firearm resulting in death. The Court of Appeal affirmed the convictions on direct appeal. (*People v. Whitley* (Nov. 22, 2019, H043651) [nonpub. opn.].) Whitley is not a party to the present action arising out of Emanuel's petition for resentencing.

In 2018, the Legislature overhauled the state's murder statutes. Citing the "bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability" (Stats. 2018, ch. 1015, § 1(d)), the Legislature enacted Senate Bill No. 1437 "to more equitably sentence offenders in accordance with their involvement in homicides" (Stats. 2018, ch. 1015, § 1(b)). Pertinent here, Senate Bill No. 1437 significantly narrowed the scope of the felony-murder rule by adding subdivision (e) to Penal Code section 189. Under that provision, "[a] participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs" can be liable for murder if the person was "the actual killer" or, "with the intent to kill," aided and abetted "the actual killer in the commission of murder in the first degree." (§ 189, subd. (e)(1), (2); *People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) A person who did not kill or act with the intent to kill can be liable for murder under the felony-murder doctrine only if he or she "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[3] (§ 189, subd. (e)(3); *Strong*, at p. 708.)

---

[3] Section 190.2, subdivision (d) provides that "every person, not the actual killer, who, with reckless indifference to human

Senate Bill No. 1437 also added former section 1170.95 to the Penal Code, creating a procedural mechanism for those previously convicted of murder under a theory amended in the bill to petition for resentencing. (See former § 1170.95, Stats. 2018, ch. 1015, § 4; *Strong, supra,* 13 Cal.5th at p. 708.)[4] The process begins with the filing of a petition that declares, among other things, that "[t]he petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019," the effective date of Senate Bill No. 1437. (§ 1172.6, subd. (a)(3); *id.,* subd. (b)(1)(A).) If the trial court determines that the petitioner has made a prima facie case for relief, it "shall issue an order to show cause." (§ 1172.6, subd. (c).) At the evidentiary hearing that follows, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under state law as amended by the bill. (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and

_____

life and as a major participant," aids or abets an enumerated felony that results in death, may be convicted of the felony-murder special circumstance and sentenced to death or life imprisonment without the possibility of parole.

[4] Emanuel's petition for resentencing was adjudicated under former section 1170.95. In 2021, the Legislature amended that section in several respects that do not affect our consideration of the issues raised in this appeal. (Stats. 2021, ch. 551, § 1, subd. (b); see *People v. Arellano* (2024) 16 Cal.5th 457, 468.) In 2022, the Legislature renumbered former section 1170.95 as section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10; see *Arellano,* at p. 468.) Unless stated otherwise, citations refer to the current version of the statute codified in section 1172.6.

the petitioner shall be resentenced on the remaining charges." (*Ibid.*) If murder was charged generically, and the target offense was not charged, the petitioner's "conviction shall be redesignated as the target offense or underlying felony for resentencing purposes." (*Id.*, subd. (e).)

On December 20, 2018, following the enactment of Senate Bill No. 1437, Emanuel filed a petition for resentencing. On November 2, 2020, the trial court issued an order to show cause, finding the petition established a prima facie case for relief. The parties relied on the original trial record; neither party presented new evidence. At the evidentiary hearing, the trial court found there was no evidence that, prior to the robbery, Emanuel knew Whitley was armed or likely to use lethal force. The trial court concluded that Emanuel should have acted to "prevent" the shooting as the robbery unfolded, however, asking: "What did he do other than, I'm out of here. Don't do that." In the trial court's view, Emanuel "created" the situation by participating in the robbery, and thus, had an affirmative obligation to do more than withdraw his aid and support from a murderous cohort. In the written decision that followed, the trial court denied the petition on the merits, finding proof beyond a reasonable doubt that Emanuel was a major participant in the robbery who acted with reckless indifference to human life. The written order likewise emphasized that Emanuel should have done more to prevent the shooting from happening.

Emanuel appealed, arguing the evidence was insufficient to support a finding of reckless indifference; he did not challenge the trial court's major participant finding. In an unpublished opinion, the Court of Appeal affirmed. (*Emanuel, supra*, H049147.) The Court of Appeal, largely adopting the

reasoning of the trial court, held that "as one who planned the robbery and was one of its intended beneficiaries, Emanuel had the ability to prevent it from happening or could have done more to prevent Whitley from shooting [Sonenberg]." (*Ibid.*) We granted Emanuel's petition for review.

## II. DISCUSSION

### A. History of the Reckless Indifference Standard

We have not yet had occasion to interpret the felony-murder rule as amended by section 189, subdivision (e)(3). As noted above, however, the major participant and reckless indifference standards did not originate with Senate Bill No. 1437. Rather, the Legislature imported those standards from section 190.2, subdivision (d), which governs the felony-murder special circumstance. (§ 189, subd. (e)(3) [imposing liability for felony murder if the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2"].) This Court, on several occasions, has laid out the history of section 190.2, subdivision (d). (See *People v. Banks* (2015) 61 Cal.4th 788, 794, 798–800 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522, 616–617 (*Clark*); *In re Scoggins* (2020) 9 Cal.5th 667, 674–675 (*Scoggins*); *Strong*, *supra*, 13 Cal.5th at p. 705.) We need not repeat it here at length.

In brief, the major participant and reckless indifference concepts trace their origin to a pair of United States Supreme Court decisions — *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) — that articulate the constitutional limits of capital punishment for accomplices to felony murder. (See *Scoggins*, *supra*, 9 Cal.5th at pp. 674–675.) In *Enmund*, the high court held that a

minor participant in an armed robbery (the getaway driver), who neither intended to kill nor had any other culpable mental state, was ineligible for the death penalty. (*Scoggins*, at p. 675, citing *Enmund*, at pp. 791, 801; accord, *Tison*, at p. 149.) A few years later, the high court revisited the issue in *Tison*, considering the case of defendants who broke two convicted murderers out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint while the escapees deliberated whether to kill them, and then abandoned the victims in the remote desert after the escapees shot them. (*Tison*, at pp. 139–141.) The court held that "major participation in the felony committed, combined with reckless indifference to human life," provides a sufficient degree of culpability to be eligible for a sentence of death. (*Id.* at p. 158.) Section 190.2, subdivision (d), added by voter initiative in 1990 (Prop. 115, as approved by voters, Primary Elec. (June 5, 1990), § 10) was designed to codify the holding of *Tison* and, by extension, the related holding of *Enmund*. (See *Banks*, *supra*, 61 Cal.4th at p. 794.) Section 190.2, subdivision (d), by its text, imposes an actus reus requirement, i.e., major participation in the enumerated felony, and a mens rea requirement, i.e., reckless indifference to human life. (*Scoggins*, at p. 674, citing *Banks*, at p. 798.)

Thereafter, in our own pair of cases — *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 — this Court endeavored to elucidate the contours of the major participant and reckless indifference standards. (See *Strong*, *supra*, 13 Cal.5th at pp. 705–707.) "Because the language derived from United States Supreme Court felony-murder precedent, we looked to that case law for guideposts." (*Id.* at p. 705.) We observed that *Enmund* and *Tison* "collectively place conduct on

a spectrum" of culpability, "with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, at p. 794.) We cautioned that, though the conduct of the defendants in *Enmund* and *Tison* mark opposite ends of the spectrum for "nonkiller felony murders," Enmund's actions do not represent "the outer limit of conduct immune from death eligibility," any more than the Tisons' actions represent "the constitutional minimum level of culpability for death eligibility." (*Id.* at p. 811.)

To guide the "fact-intensive, individualized inquiry" into where a defendant's conduct falls on the spectrum of culpability (*Scoggins*, *supra*, 9 Cal.5th at p. 683, citing *Enmund*, *supra*, 458 U.S. at p. 798), in *Banks* we identified a list of considerations relevant to the major participant prong. (*Strong*, *supra*, 13 Cal.5th at p. 705, citing *Banks*, *supra*, 61 Cal.4th at p. 803.) Similarly, in *Clark* we identified a list of considerations relevant to the reckless indifference prong. (*Strong*, at p. 706, citing *Clark*, *supra*, 63 Cal.4th at pp. 618–623.) In amending section 189, which governs murder liability generally, Senate Bill No. 1437 imported the actus reus and mens rea requirements from the special circumstance statute. "It is undisputed that when Senate Bill [No.] 1437 amended Penal Code section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark*." (*Strong*, at p. 710.) We are therefore guided in this case by our pronouncements in *Banks* and *Clark*, and our application of their requirements in *Scoggins*.

14

As set forth by the United States Supreme Court, "[r]eckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'" (*Scoggins*, *supra*, 9 Cal.5th at p. 676, quoting *Tison*, *supra*, 481 U.S. at p. 157.) "Examples include 'the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.'" (*Scoggins*, at p. 676, quoting *Tison*, at p. 157.) Although the high court's examples describe actual killers, not accomplices to felony murder, we explained they nonetheless "provide some indication of the high court's view of 'reckless indifference' . . . ." (*Clark*, *supra*, 63 Cal.4th at pp. 616–617.) Namely, reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, at p. 617.)[5]

After extrapolating these animating principles from *Tison*, we went on to explain that reckless indifference encompasses both subjective and objective elements. (*Scoggins*, *supra*, 9 Cal.5th at p. 677, citing *Clark*, *supra*, 63 Cal.4th at p. 617.) "As to the subjective element, '[t]he defendant must be

_____

[5] As stated above, we have observed that *Enmund* and *Tison* "collectively place conduct on a spectrum" of culpability for non-killer felony murderers. (*Banks*, *supra*, 61 Cal.4th at p. 794.) Liability may be imposed only "when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Ibid.*) As indicated by use of the term "encompasses," "a willingness to kill (or to assist another in killing)" is one example of reckless indifference. (*Clark*, *supra*, 63 Cal.4th at p. 617.)

aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' " (*Scoggins*, at p. 677, quoting *Banks*, *supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) "As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Scoggins*, at p. 677, quoting *Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).)

"The degree of risk to human life is crucial to the analysis." (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) As the United States Supreme Court has acknowledged, " 'the possibility of bloodshed is inherent in the commission of any violent felony,' " such that one who perpetrates or attempts to perpetrate such a crime may well anticipate "the use of lethal force as a *possibility*." (*Banks*, *supra*, 61 Cal.4th at p. 808, italics added, quoting *Tison*, *supra*, 481 U.S. at p. 151.) Were that degree of culpability sufficient, however, it would amount to " 'little more than a restatement' " of the former felony-murder rule that Senate Bill No. 1437 retired. (*Banks*, at p. 808, quoting *Tison*, at p. 151.) " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*Scoggins*, at p. 677, quoting *Banks*, at p. 808.) This Court has thus made clear that participation in a " 'garden-variety armed robbery,' " i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun,

is insufficient without more to establish reckless indifference. (*Strong*, *supra*, 13 Cal.5th at p. 719, quoting *Banks*, *supra*, 61 Cal.4th at p. 802; see also *Scoggins*, 9 Cal.5th at p. 682 [observing that, although any person who plans or participates in an armed robbery can be said to anticipate that lethal force might be used, only about 1 in 200 armed robberies result in death]; *Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74.)

To aid in distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators, *Clark* "set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks." (*Strong*, *supra*, 13 Cal.5th at p. 706, citing *Clark*, *supra,* 63 Cal.4th at pp. 618–623.)  " '[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.)  The "totality of the circumstances" must be analyzed to determine whether the defendant acted with reckless indifference.  (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)[6]

---

[6]     In his briefing before this Court, Emanuel raises the issue of his youth at the time of the offense.  Emanuel was 21 years of age at the time of the robbery, while Whitley was 20 years of age, Amini was 23 years of age, and Sonenberg was 18 years of age.  Courts of appeal have recognized that "a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life." (*In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*); *People v. Ramirez* (2021) 71

### B. Application to the Facts of This Case

We turn, then, to the application of these principles to the facts of this case, reviewing the denial of Emanuel's section 1172.6 petition, following an evidentiary hearing, for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) Under this standard, "we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact' " ' " could find beyond a reasonable doubt that Emanuel acted with reckless indifference. (*Ibid.*)

#### 1. *Use of or Awareness of the Presence of Weapons and Knowledge of Cohort's Likelihood of Killing*

Emanuel did not use a gun or other weapon during the robbery. The only gun was used by Whitley. The trial court expressly found "there was no evidence in the record demonstrating that, prior to the robbery, Emanuel knew Whitley possessed a gun, would bring that gun to the robbery, or 'was likely to use lethal force.' " (*Emanuel, supra*, H049147.) The Court of Appeal concluded the same. (*Ibid.*)[7] The *Clark*

---

Cal.App.5th 970, 990–991; see also *Miller v. Alabama* (2012) 567 U.S. 460, 477 [identifying, among the "hallmark features" of youth, the "failure to appreciate risks and consequences"].) As Emanuel acknowledges, however, he did not raise the issue of his youth in the proceedings below, and the lower courts did not address the issue in rendering their decisions. We therefore decline Emanuel's invitation to discuss the significance of his youth for the first time here, given our conclusion that the evidence is otherwise insufficient to support a finding of reckless indifference to human life.

[7]     The findings of the trial court upon conflicting evidence are conclusive. (*Wilbur v. Wilbur* (1925) 197 Cal. 1, 7.)

factors concerning use of or awareness of weapons and knowledge of a cohort's propensity for violence therefore do not weigh in favor of a finding of reckless indifference.

### 2. Duration of the Crime

Neither the trial court nor the Court of Appeal explicitly addressed the duration of the felony. A lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence. "Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant. . . . Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620.)

Here, the Attorney General acknowledges that the duration of the contact between Sonenberg, Whitley and Emanuel was "likely not more than 12 minutes," and the duration of the violent contact between Sonenberg and Whitley was "presumably even less than that." (See *In re Bennett* (2018) 26 Cal.App.5th 1002, 1024 [describing minutes-long encounter as "negligible" in concluding that the duration of the felony did nothing to increase the risk of violence beyond that inherent in the crime].) Sonenberg texted to say he had arrived at the park at 3:06 p.m., indicating that he, Whitley, and Emanuel had not yet met up. The police dispatch went out at 3:20 p.m., as did the first call from Emanuel's phone to Santos. That leaves, at most, 14 minutes for the three men to convene, the struggle between Whitley and Sonenberg, the shooting, the collision of Sonenberg's truck, and the summoning of emergency responders by witnesses. Eyewitness testimony placed the gunshot at

closer to 3:15 p.m., narrowing the relevant timeframe to approximately nine minutes.

Focusing on the period of the violent confrontation, the available evidence, including forensic evidence, reflects that Whitley shot Sonenberg during a brief struggle. There was no prolonged period of restraint, and the interaction appears to have been nonviolent until Sonenberg refused to relinquish the marijuana without payment. It was at that point that Emanuel said to Whitley, "let's go." The prosecutor stated during closing argument, "Now, this happened fast. This happened real fast. . . . [¶] . . . This man, Jacob Whitley leaned in [to Sonenberg's truck] just enough to crack him over the head and put a bullet through him and snatch his pound of wee[d] in the Vans shoebox and get out just in time before [Sonenberg's truck] backed away." The *Clark* factor concerning duration of the crime therefore is neutral in this case; it did nothing to heighten the risk of violence beyond that inherent in the robbery itself.

### 3. Efforts Taken to Minimize the Risk of Violence

We next consider any efforts the defendant made to minimize the risk of violence in the commission of the felony. The trial court noted that the robbery occurred around 3:00 p.m. on a residential street adjacent to a park and observed that "the commission of the crime during daylight hours in public view may have had the potential for minimizing violence . . . ." (See *Scoggins*, *supra*, 9 Cal.5th at p. 683 [although an unarmed assault and robbery contemplated the use of some violence, planning that it "take place in a public parking lot during the daytime, when the possible presence of witnesses might reasonably be thought to keep [the defendant's] accomplices within the bounds of the plan" tended to minimize the risk of

lethal violence].)   The trial court nonetheless discounted this factor because "there is no evidence that the robbery was planned for that time or that it was planned to occur at that time for the purpose of minimizing the risk of violence."

To the contrary, the record demonstrates Whitley and Emanuel arranged to meet Sonenberg at Cherry Park at approximately 2:30 p.m.   They did not meet at that time and location by happenstance.   We have never required direct evidence that a felony was planned a certain way for the express purpose of minimizing the risk of violence; circumstantial evidence regarding the plan itself may suffice.   (See *Scoggins*, *supra*, 9 Cal.5th at p. 683.)   Indeed, before noting that certain elements of the defendant's plan tended to minimize the potential for violence in *Scoggins*, we recognized that the need to minimize the risk of violence is " 'less pressing' " when the planned crime does not involve " 'the use of weapons.' "   (*Ibid.*) " 'This fact is, by itself, a significant step towards minimizing the likelihood that the plan would result in a "grave risk of death." ' "   (*Ibid.*)   Here, as in *Scoggins*, the trial court found the record does not contain evidence that Emanuel planned a robbery involving the use of weapons.   Nor does the record contain evidence that Emanuel knew Whitley had a propensity for violence.   Emanuel planned to participate in a robbery in a public location during daylight hours.   The crime occurred in the open where witnesses might be present to observe from the park, passing vehicles, or nearby residences.   This factor therefore does not support a finding of reckless indifference.

We note that, although the Court of Appeal endorsed the trial court's finding that Emanuel "had an opportunity to minimize the risk of violence during the robbery itself but failed to do so," the court conflated this *Clark* factor with the factor

concerning physical presence at the scene and opportunity to restrain confederates or aid victims, which we discuss separately below. (*Emanuel*, *supra*, H049147.) Rather than analyze the facts identified by the trial court as relevant to the minimization of risk during the planning stage, the Court of Appeal reiterated its analysis of facts relating to Emanuel's actions during the robbery. (*Ibid.*) Efforts at the planning stage to minimize the potential for violence, however, are viewed as a distinct factor from efforts to restrain confederates once the felony is underway. (See *Clark*, *supra*, 63 Cal.4th at p. 623 [assessing whether the defendant "planned the crime with an eye to minimizing the possibilities for violence"].) The authorities cited by the Court of Appeal likewise concern restraint, not minimization. (*Emanuel*, *supra*, H049147, citing *In re McDowell* (2020) 55 Cal.App.5th 999, 1014 (*McDowell*) and *In re Loza* (2017) 10 Cal.App.5th 38, 51 (*Loza*).) Lower courts should take care to consider the presence or absence of evidence relating to each relevant factor on its own merits before considering the evidence in its totality.

The Court of Appeal's assertion that Emanuel "had an opportunity to minimize the risk of violence . . . but failed to do so," suggests this factor weighs *in favor* of a finding of reckless indifference unless Emanuel made such efforts. That is not necessarily so. "If the evidence supports an argument that defendant engaged in efforts to minimize the risk of violence in the felony, defendant may raise that argument" and the trial court "shall consider it as being part of all the relevant circumstances that considered together go towards supporting or failing to support" a finding of reckless indifference. (*Clark*, *supra,* 63 Cal.4th at p. 622.) "[T]he existence of efforts to minimize violence does not necessarily foreclose a finding of

reckless indifference to human life" (*Scoggins*, *supra*, 9 Cal.5th at p. 682), however, given the "two-part nature of the mens rea" requirement. (*Clark*, at p. 622.) Where an "objective evaluation of the circumstances" of the crime suggests the risk of violence is grave, the defendant's apparent efforts to minimize that risk may be unavailing. (*Scoggins*, at p. 683, citing *Clark*, at pp. 622–623.) Conversely, the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of the planned crime suggest the risk of violence posed is no more than that inherent in any violent felony. (See *Scoggins*, *supra*, 9 Cal.5th at p. 679 [observing that the defendant "had no reason" to instruct his cohorts to "avoid using lethal force" because his plan "did not contemplate any use of lethal force," and unlike the defendants in *Tison*, "he had no reason to suspect that his accomplices were armed or planning to kill" the victim].) In such a case, then, the absence of efforts to minimize the risk of violence cannot be said to weigh in favor of a finding of reckless indifference. This applies all the more so when the planned crime does not involve the use of weapons.

The Attorney General endorses a similar and even broader view than that adopted by the Court of Appeal, faulting Emanuel for having failed to prevent *the robbery* from occurring. The Attorney General asserts that Emanuel "could have called the robbery off at several points prior to December 11, yet he did not." The felony-murder doctrine comes into play only where a defendant perpetrates or attempts to perpetrate an underlying felony. Participation in the underlying felony is presupposed but no longer sufficient to impose murder liability. Where a defendant is not the actual killer or an aider and abettor acting with intent to kill, Senate Bill No. 1437 tasks us to distinguish between defendants who participate in a violent felony posing

only the foreseeable risk of death inherent in any such crime (who are not liable for deaths that may occur during its commission) from those who knowingly engage in criminal activities known to carry a grave risk of death (who are liable). That Emanuel failed to stop the robbery from occurring does not aid in distinguishing the two.

In any event, even if the circumstances cited by the trial court do not reflect affirmative efforts by Emanuel to minimize the risk of violence at the planning stage, they nonetheless reflect aspects of the felony — beyond those already captured by the other enumerated *Clark* factors — "that provide insight into both the magnitude of the objective risk of lethal violence" posed by the planned crime and Emanuel's "subjective awareness of that risk." (*Clark, supra,* 63 Cal.4th at p. 623; see also *Strong, supra,* 13 Cal.5th at p. 706 [noting that *Clark* "set out a *nonexhaustive* list of considerations" relevant to the reckless indifference inquiry (italics added)].) Where a defendant plans to commit an armed home invasion robbery at 3:00 a.m., with knowledge of several armed occupants and a methamphetamine operation within, for example (see *McDowell, supra,* 55 Cal.App.5th at p. 1005), a trier of fact might reasonably conclude that the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator is graver than the risk of violence inherent in any violent felony. By contrast, where a defendant plans to commit an unarmed robbery of a marijuana dealer at a public park in the middle of the afternoon, the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator is far less grave.

### 4. *Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid Victims*

With the foregoing in mind, we consider the last of the enumerated *Clark* factors:  physical presence at the scene and opportunity to restrain the violence or aid the victim. "Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force.  In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . .   [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.  If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark*, *supra*, 63 Cal.4th at p. 619.)

Both the trial court and the Court of Appeal placed much emphasis on Emanuel's "physical proximity" to and purported opportunity to restrain the crime. (*Emanuel, supra*, H049147.) The Court of Appeal stated:  "The trial court could legitimately conclude that, as one who planned the robbery and was one of its intended beneficiaries, Emanuel had the ability to prevent it from happening or could have done more to prevent Whitley from shooting [Sonenberg].  Although, according to Emanuel, he encouraged Whitley to let [Sonenberg] keep the marijuana and walk away, it became apparent Whitley was ignoring his advice when Whitley struck [Sonenberg] with his gun.  There is no evidence that Emanuel made any further attempt to dissuade Whitley or intercede, perhaps by trying to take the gun from

25

Whitley or distracting him so that [Sonenberg] might have driven away." (*Ibid.*)

In support of this analysis, both lower courts and the Attorney General rely on *McDowell*, *supra*, 55 Cal.App.5th 999 and *Loza*, *supra*, 10 Cal.App.5th 38. In *McDowell*, after the victim refused to hand over drugs during a home invasion robbery, the defendant's coparticipant fired a warning shot into the floor. (*McDowell*, at p. 1005.) A third party implored the shooter not to hurt the victim, after which the victim said, " '[K]ill me if you're going to kill me.' " (*Ibid.*) A struggle ensued and the victim tried to grab the gun. (*Ibid.*) The coparticipant fired two shots, killing the victim. (*Ibid.*) Although the Court of Appeal described the case as "close to the line" (*id.* at p. 1015), it noted that the defendant had an opportunity to intervene after the warning shot and failed to do so (*id.* at pp. 1014–1015). Together with other facts, including that the defendant planned an armed robbery under conditions that carried a heightened risk of lethal violence and armed himself with a palm knife, the Court of Appeal concluded there was sufficient evidence of reckless indifference. (*Id.* at p. 1015.)

Similarly, in *Loza*, after the defendant's coparticipant demanded money from two gas station clerks and a clerk said there was no money, the coparticipant threatened to shoot the clerks, " 'saying "I ain't playing," and telling the clerks they had five seconds.' " (*Loza*, *supra*, 10 Cal.App.5th at p. 54.) One of the clerks replied, " ' "Shoot me." ' " (*Ibid.*) The armed coparticipant "counted down," then shot the clerk. (*Ibid.*) The Court of Appeal concluded that, in that time, the defendant "could have done any number of things to intercede or assist the victims — e.g., yell at [his coparticipant] to stop, try to halt the countdown, demand that they leave, distract [his coparticipant],

or attempt to calm [him], to name a few." (*Ibid.*) The court emphasized that "the shooting was not spontaneous or accidental; rather, [the coparticipant] made clear his intent to shoot, which afforded petitioner the time to observe and react before the murder." (*Id.* at p. 53.) Taken together with other facts, including that the defendant supplied the shooter with the gun immediately prior to the robbery, the court concluded there was sufficient evidence of reckless indifference. (*Ibid.*)

The instant case is unlike *McDowell* and *Loza.* In contrast to the defendants in those cases, Emanuel attempted to act as a restraining influence. In fact, the trial court appears to have accepted that he took one of the actions suggested in *Loza* — he advocated that he and Whitley leave. (See also *People v. Mitchell* (2022) 81 Cal.App.5th 575, 593 [suggesting the accomplice to felony murder could have "tried to call off the plan" or "fled the scene"].) In addition to saying "let's go," Emanuel began walking away from the robbery. This provides crucial insight into Emanuel's state of mind. When met with resistance, Emanuel abandoned the plan rather than resort to greater violence.

The courts below discounted the foregoing evidence, asserting that Emanuel could have done *more* to prevent Whitley from shooting, perhaps even "by trying to take the gun from [him]." (*Emanuel, supra*, H049147.) The district attorney at the resentencing hearing would have gone a step further, asserting that Emanuel should have "taken the bullet, if necessary." Although we consider whether a defendant acts as a restraining influence on his cohorts, it is not incumbent on a defendant to actually prevent the violence or attempt to do so by any means necessary. The Attorney General acknowledges that Emanuel need not have gone "so far as *succeeding* in preventing

the shooting, such as by disarming Whitley" (italics added), but nevertheless suggests other, more efficacious actions he might have taken, such as trying to distract Whitley. This too misses the point. The essential question underpinning our analysis is not whether Emanuel did enough to try to stop Whitley's unplanned act of violence; it is whether Emanuel acted with the requisite mens rea, i.e., reckless indifference to human life. The focus should not be on the ultimate *efficacy* of his actions, but on what his actions reveal about his mental state. The courts below did not carefully consider evidence bearing on Emanuel's state of mind but rather simply judged that he had not employed an adequate measure of restraint. That is not the standard by which we assess reckless indifference. Efforts at restraint serve as only one of several factors that should be assessed in deciding whether, in light of the totality of the circumstances, the defendant acted with reckless indifference to human life.[8]

Moreover, even setting aside Emanuel's actions before Whitley pulled out the gun, the evidence is insufficient to support a finding that Emanuel's failure to intervene reflected intentional inaction indicative of reckless indifference to human life. (See *People v. Keel* (2022) 84 Cal.App.5th 546, 560 (*Keel*) [concluding this factor was neutral where the accomplice's decision to shoot was made quickly in response to unexpected resistance]; *Moore, supra,* 68 Cal.App.5th at p. 452 [the "short duration of the robbery and the sudden and unprovoked nature

---

[8] The trial court also posited that Emanuel's actions may have been motivated by a desire to "avoid criminal liability," rather than a "desire to protect Cody." However, so long as Emanuel did not act with reckless indifference to the life of the victim, he need not have acted with the purpose of protecting the victim.

of the shooting" reinforced the conclusion that the defendant could not have restrained his accomplice's actions].) The trial court reasoned "there was at least a minimal period of time in which [Emanuel] was aware of the gun and in which he could have tried to prevent the shooting." In almost every case, "at least a minimal period of time" will elapse between the display of a gun and its firing. But where violence unfolds "quickly," a defendant may "lack control" over the actions of his confederates. (*Scoggins*, *supra*, 9 Cal.5th at p. 679.) This contrasts with cases like *Tison*, "where a long sequence of events culminated in murder," giving the defendants time to intervene. (*Scoggins*, at p. 679, citing *Tison*, *supra*, 481 U.S. at pp. 139–141.)

We do not suggest that a rapidly unfolding crime may never allow for a finding of reckless indifference to human life. But where a crime unfolds quickly, this factor — the failure to restrain a cohort — cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so. (*Keel*, *supra*, 84 Cal.App.5th at p. 560.) This requires some awareness of the risk of impending lethal violence and time to react. In *Loza* and *McDowell*, for example, although the opportunity for intervention may have been brief, the shooters in both cases made their intentions clear, affording each defendant "the time to observe and react before the murder." (*Loza*, *supra*, 10 Cal.App.5th at p. 53.) The shooters made express threats to shoot and either counted down or fired a warning shot. In this case, Whitley took no such actions.

Nor was Whitley's intent immediately clear. The trial court found, based on its review of the evidence, that "simply pulling out the gun and hitting [Sonenberg] with it did not

necessarily inform [Emanuel] that Whitley was willing to shoot." The evidence suggests that Whitley's acts were not anticipated, but rather, "a spontaneous response" to unexpected resistance from the victim. (*Banks, supra,* 61 Cal.4th at p. 807; see *Scoggins, supra,* 9 Cal.5th at p. 687 [observing that, as the crime unfolded, the defendants in *Tison* "knew that their father was debating whether to kill the victims and had ample opportunity to restrain the crime and aid the victims," but did neither]; *id.* at p. 681 [again observing that the defendants in *Tison* "had advance knowledge that lethal force might be used"].) Without forewarning that Whitley would deploy lethal violence, Emanuel's inaction is less probative. Based on the findings of the trial court, the murder was not "a culmination or a foreseeable result of several intermediate steps," nor did Whitley "exhibit[] behavior tending to suggest a willingness to use lethal force" prior to committing the fatal act itself. (*Clark, supra,* 63 Cal.4th at p. 619.)

The courts below also considered Emanuel's failure to render aid to Sonenberg. The Court of Appeal observed: "There is also no evidence that Emanuel made any effort to assist [Sonenberg], even by calling for an ambulance, after the shooting itself. Instead, Emanuel joined Whitley in fleeing the scene and leaving [Sonenberg] to his fate." (*Emanuel, supra,* H049147.) Although acknowledging that Emanuel's actions "after he fled the scene are inherently of less value," the trial court also considered that he "remained in Whitley's presence," made efforts to avoid arrest (such as disposing of the phone and asking Santos to lie to the police), and "made no effort to assist the police in solving the crime." The Court of Appeal, on the other hand, found Emanuel's postflight conduct "ambiguous at best," observing that "it is unclear whether these actions

demonstrated that he acquiesced or approved of Whitley's use of lethal violence, or whether he simply wanted to avoid arrest." (*Emanuel, supra,* H049147.) The Court of Appeal further noted that, according to Santos, both Emanuel and Whitley "were panicked after the shooting." (*Ibid.*)

We have recognized that a defendant's conduct following the use of lethal force may be reflective of his or her mental state during the offense, noting that the United States Supreme Court considered the failure to render aid to the victims in *Tison.* (*Scoggins, supra,* 9 Cal.5th at p. 679, citing *Clark, supra,* 63 Cal.4th at p. 619; *Tison, supra,* 481 U.S. at pp. 151–152.) The defendants in *Tison* guarded the victims at gunpoint while their murderous cohorts deliberated whether to kill them. (*Tison,* at p. 151.) The high court observed that the defendants "stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting." (*Ibid.*) At least one of the victims initially survived the shooting but later succumbed to her severe injuries. (*Id.* at p. 141.) Notably, the defendants abandoned the victims in the remote desert after disabling the only vehicle — and chance of survival — available to them. (*Id.* at pp. 140–141.) The high court opined that these facts indicated, not only that the defendants' participation in the crime was "anything but minor," but also that they "subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id.* at p. 152.)

This court has also observed that "when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state." (*Scoggins, supra,* 9 Cal.5th at p. 679.) In *Clark,* for example, we observed that the "ambiguous circumstances surrounding [the defendant's] hasty departure"

from the scene of the shooting made it "difficult to infer his frame of mind concerning [the victim's] death." (*Clark*, *supra*, 63 Cal.4th at p. 620.) There, the defendant fled from the scene in his vehicle, leaving behind the shooter and the victim. (*Ibid.*) We said it could be inferred that the defendant "was motivated to flee the scene by that point to avoid arrest, whether or not he had seen the body of the victim." (*Ibid.*) Abandonment of the shooter could be interpreted as a rejection of the shooter's actions or simply indicative of the defendant's desire to "flee the scene as quickly as possible, without regard for [the shooter's] welfare or that of the shooting victim." (*Ibid.*) Unlike in *Tison*, the defendant in *Clark* would have known that help was on the way because a patrol car approached as he fled the scene. (*Ibid.*)

Looking at the instant case, we note that Emanuel had no meaningful opportunity to aid Sonenberg before the shooting. (Cf. *Tison*, *supra*, 481 U.S. at p. 151.) Where a defendant is aware of the risk of impending lethal violence, he or she may opt to aid the victims — for example, by permitting them to flee — rather than attempt to restrain his or her coperpetrator. Because there was no prolonged period of restraint or forewarning that Whitley would deploy lethal violence, Emanuel had no such opportunity. We further note that Emanuel took no actions after the shooting that might prevent or interfere with Sonenberg's ability to obtain or chances of receiving aid. (Cf. *Tison*, at pp. 140–141, 151.)

On the record here, we conclude the circumstances of Emanuel's flight make it difficult to infer his frame of mind concerning Sonenberg's death. (*Clark*, *supra*, 63 Cal.4th at p. 620.) The shooting occurred in the afternoon in a residential area adjacent to a public park. The sound of the gun firing was followed immediately by screeching tires and the collision of

Sonenberg's truck with a tree. The evidence shows that numerous witnesses were nearby and heard the commotion, and at least two of them called 911. Sirens could be heard approaching shortly after the shooting and first responders arrived on the scene within minutes. Much as in *Clark*, these circumstances are susceptible to differing interpretations. (*Ibid.*) Considering the location and timing of the shooting, it could be inferred that Emanuel was motivated to flee the scene as quickly as possible to avoid arrest, whether or not he understood the extent of Sonenberg's injuries. (*Clark*, at p. 620.) Particularly where the presence of other persons nearby makes it more likely that Sonenberg would receive aid without intervention by Emanuel. (See *Scoggins*, *supra*, 9 Cal.5th at p. 680 [observing there was "no occasion for [the defendant] to seek further assistance" when "other bystanders had already called the police"].)

The other postflight conduct relied upon by the trial court is simply too attenuated. Reckless indifference requires that the defendant "consciously disregard 'the significant risk of death his or her actions create.' " (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) This state of mind must exist at the time of the underlying felony. While postflight conduct may shed light on a defendant's state of mind, conduct temporally removed from the violent act must clearly evince a culpable mental state. (See *id.* at p. 680 [concluding the defendant's conduct and demeanor after the shooting was ambiguous where it "might indicate" that he "anticipated the use of lethal force" but also "might indicate" a less culpable mind state].) As the lower courts readily acknowledged, Emanuel's postflight conduct reflects a desire to avoid arrest. Some of that conduct, such as disposing of the phone used to contact Sonenberg, was incriminating as a

general matter. But on this record it reveals little about whether he acted with the requisite state of mind when the shooting occurred. (See *People v. Pearson* (2013) 56 Cal.4th 393, 461 [observing that the defendant's expressions of remorse during a police interview were not "relevant to his state of mind at the time of the murders"].) However contemptable we may find a defendant's conduct following a killing, the governing standard is not satisfied by evidence that the defendant was generally indifferent to the fact that someone *has been* killed; it requires evidence that, at the time of the shooting, the defendant acted with indifference toward the grave risk that someone *could be* killed. Though the former may be evidence of the latter, it is insufficient, standing alone, to support murder liability.

As the Court of Appeal acknowledged (see *Emanuel, supra,* H049147, quoting *In re Taylor* (2019) 34 Cal.App.5th 543, 560), even if a defendant is unconcerned that the planned felony resulted in a death, there must also be evidence that the defendant was aware of and willingly involved in the violent manner in which the felony was committed and consciously disregarded the significant risk of death that his or her actions created. Here, based on the trial court's findings, there is no evidence Emanuel planned anything other than a strong-arm daylight robbery in a public park. Nor is there evidence that his actions created a grave risk of death. Accordingly, although Emanuel's conduct after the shooting may be offensive, given the "relative paucity" of other evidence supporting a finding of reckless indifference to human life, his culpability falls short of the benchmark set by section 189, subdivision (e)(3). (*Clark, supra,* 63 Cal.4th at p. 623 [evidence of reckless indifference was insufficient despite the fact that the defendant fled the scene

without rendering aid to the victim]; *Taylor*, *supra*, 34 Cal.App.5th at p. 560 [evidence was insufficient to support a finding of reckless indifference, even though the defendant made no attempt to aid the victim and instead helped the shooter flee the scene].)

### 5. *Totality of the Circumstances*

In sum, the evidence shows Emanuel set out to commit a robbery in a public place in the middle of the afternoon. He was not armed, and the trial court found he did not know Whitley was armed or likely to use lethal force. Accordingly, there was nothing in the plan that "elevated the risk to human life beyond those risks inherent in any armed robbery," much less a planned unarmed robbery. (*Clark*, *supra*, 63 Cal.4th at p. 623.) The crime unfolded without a prolonged period of restraint. When met with unexpected resistance, Emanuel told Whitley, "let's go," and began to walk away. This tends to show that Emanuel was unwilling to engage in further violence to accomplish the aims of the robbery. Whitley, on the other hand, pulled out a gun, hit Sonenberg with it, and fatally shot him in the neck.

The trial court acknowledged that many of the *Clark* factors were neutral or did not weigh in favor of a finding of reckless indifference. In its view, however, Emanuel "started the chain of events" that endangered Sonenberg's life, i.e., the robbery, and then tried to "wash" his hands of it after Whitley pulled out a gun. This, the trial court found, was insufficient to avoid murder liability. The courts below would have had Emanuel do more to intercede, such as attempt to disarm Whitley. But such a mechanical focus on unsuccessful or inadequate efforts at restraint risks imposing murder liability based solely on a defendant's participation in an underlying

felony in which a death occurs. This is precisely what Senate Bill No. 1437 and our case law prohibit.

Although Emanuel fled the scene without rendering aid to Sonenberg, his conduct after the shooting is ambiguous. It may reflect a lack of regard for Sonenberg's welfare; it may reflect a desire to avoid arrest; or it may reflect both. Standing alone, however, it is insufficient to demonstrate that Emanuel acted with reckless indifference to human life. In concluding otherwise, the courts below applied the *Clark* factors in a manner divorced from their animating principles. The nonexhaustive list of factors identified as relevant to the reckless indifference inquiry must not supplant the standard they are meant to elucidate.

### III. DISPOSITION

We reverse the judgment of the Court of Appeal with instructions to remand the case to the trial court to grant Emanuel's petition for resentencing, vacate his murder conviction, and resentence him. (See § 1172.6, subds. (d)(3), (e).)

**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Emanuel

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 5/12/23 – 6th Dist.
**Rehearing Granted**

_____

**Opinion No.** S280551
**Date Filed:**  June 2, 2025

_____

**Court:**  Superior
**County:**  Santa Clara
**Judge:**  Vanessa A. Zecher

_____

**Counsel:**

Solomon Wollack, under appointment by the Supreme Court, for Defendant and Appellant.

Galit Lipa, State Public Defender, and AJ Kutchins, Deputy State Public Defender, for the Office of the State Public Defender as Amicus Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit, Bridget Billeter, Linda M. Murphy, Amit Arun Kurlekar and Sarah J. Farhat, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Solomon Wollack
Attorney at Law
P.O. Box 23933
Pleasant Hill, CA 94523
(925) 671-2501

Sarah J. Farhat
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3792